**C.M. ASFAHL AGENCY, Appellant**

v.

**TENSOR, INC.; Quality Drilling Technology, Inc.; Quantum Solutions, Inc.; and Allied Signal, Inc., Appellees.**

**Tensor, Inc.; Quality Drilling Technology, Inc.; and Quantum Solutions, Inc., Appellants**

v.

**C.M. Asfahl Agency, Appellee.**

**No. 01–01–00692–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 29, 2004.

Rehearing Overruled May 6, 2004.

Robert B. Dubose, Cook & Roach, LLP, Robert M. Roach, Jr., Cook, Roach & Lawless, L.L.P., Roger R. Evans, Evans & Kosut, P.C., Houston, TX, for Appellant.

Daniel K. Hedges, Joanne M. Vorpahl, Jennifer Elizabeth Bloom, Porter & Hedges, L.L.P., Jesse R. Pierce, Clements, O'Neill, Pierce & Nickens, Houston, TX, for Appellees.

Panel consists of Justices TAFT, JENNINGS, and ALCALA.

## OPINION

ELSA ALCALA, Justice.

Appellant and appellee, C.M. Asfahl Agency (the Agency), plaintiff below, entered into sales and marketing agreements with appellants and appellees, Tensor, Inc. (Tensor), Quality Drilling Technology, Inc. (QDT), and Quantum Solutions, Inc. (QSI) (collectively, the Tensor parties), defendants below, which entities eventually merged into a single Tensor entity.[1] In 1998, appellee, Allied Signal, Inc. (Allied Signal), also a defendant below, and Tensor executed an agreement by which Allied Signal purchased the Tensor assets. Allied Signal maintained that, under the terms of the asset-purchase agreement and because it had purchased only the Tensor assets, the Agency no longer had any right to receive commissions under its sales and marketing agreements with the Tensor parties. Asfahl[2] disagreed and, through the Agency, sued the Tensor parties, Allied Signal, George F. Roberts, a Tensor principal, and Robert L. Waters, an Allied Signal principal.[3]

The Agency sought recovery for claims that included breach of the sales and marketing agreements, tortious interference with those agreements by Allied Signal, quantum meruit, violations of the Sales Representative Act,[4] fraud, fraudulent transfer, conspiracy, and indemnity. The trial court resolved most of these claims by partial summary judgment before trial began or before the case was submitted to the jury, either by directed verdict or refusal to include the Agency's theories in the jury charge.

The Tensor parties and Allied Signal did not present any evidence at trial and rested after the Agency completed its case-in-chief. The case was submitted to the jury under a breach-of-contract theory of liability. The jury found that the Tensor parties failed to comply with the sales agreements with the Agency and awarded $906,793.90 in actual damages for commissions due under the agreements, $1,328,922.00 in attorney's fees for preparation and trial, with additional awards of $48,000.00 and $40,000.00 for appeals through the Texas courts. The trial court rendered judgment on this verdict.[5] In accordance with the jury's finding that 28.6 percent of commissions due to the Agency were from wholesale sales, the trial court's judgment adjudicated the Tensor parties jointly and severally liable for an additional $518,686.10 as trebled damages under the Sales Representative Act.

The Agency's appeal presents six points of error that challenge the trial court's directing a verdict in favor of the Tensor

---

1. Quality Drilling was formed by Tensor and Quantum Solutions, which merged in 1996.

2. Except when required by the record, we refer to C.M. Asfahl individually as "Asfahl" and to the C.M. Asfahl Agency as "the Agency."

3. The trial court severed the Agency's claims against Roberts and Waters from this cause, and they are not parties to this appeal.

4. TEX. BUS. & COM.CODE ANN. §§ 35.81–.86 (Vernon 2002).

5. The Tensor parties are the only parties who are liable under the judgment.

parties and refusing to submit certain damages issues to the jury, failing to treble all of the Agency's damages for unpaid commissions, directing a verdict in favor of Allied Signal on the Agency's claim of tortious interference with a contract, and rendering summary judgment against the Agency on its fraudulent transfer and quantum-meruit claims.

The Tensor parties' appeal presents six contentions, framed as "issues," in which they argue that (1) the trial court erred by permitting the jury to award the Agency actual damages for commissions relating to certain sales, or (2), alternatively, that the judgment of the trial court should be reformed because the evidence is factually insufficient to support the damages awarded; (3) the treble damages awarded to the Agency under the Sales Representative Act should be vacated; (4) the trial court erred by admitting the Agency's damages summary; and (5) the judgment of the trial court should be reversed and the cause remanded because the evidence offered to support the award of attorney's fees did not segregate between recoverable and non-recoverable claims, or (6), alternatively, the judgment should be reformed because the fees awarded are excessive.

We overrule the Agency's points of error. We sustain the Tensor parties' issue and overrule their remaining issues. We affirm in part and reverse and render in part.

## Background

The Tensor parties manufactured magnetometers, which are highly specialized, sophisticated components used in proximity-detection machinery for the oil and gas industry. Engineers who formed Tensor in 1975 had developed the magnetometers for use in its business. After Tensor began to sell its machines to other companies, which incorporated the Tensor products into their own machinery and equipment, Asfahl proposed marketing Tensor magnetometers to other companies.

### The Agency's Sales Agreements with the Tensor Parties

The Agency had sales agreements with each of the Tensor parties. The Agency's first agreement was with Tensor, in 1981. The agreement with QSI was in 1991, and the agreement with QDT was in 1993. Asfahl drafted each agreement without legal assistance, and each agreement differs from the others. He referred to "a book" when he drafted the later contracts, which he considered improvements over the Agency's first agreement with Tensor.

#### A. Territory and Commissions

The sales agreement with Tensor granted the Agency a 10 percent commission; the QDT and QSI agreements provided the Agency a five percent commission. The QDT agreement is the broadest of the three agreements, in that it is not limited to specific companies and covers a territory broadly defined as consisting of the United States, Canada, and Mexico, for which the Agency was granted exclusive commission rights. Asfahl worked alone and had no sales associates. The Agency's income from the three agreements was substantial and totaled over $1.3 million in commissions in 1997 alone.

#### B. "Continuity" Provisions

Each of the three sales agreements included a provision that the parties refer to as a "continuity" clause. Under the Agency's agreement with Tensor, the "rights" granted by the agreement endured "for such time as [the customer in question, as named in the agreement] has active purchase orders or contracts accepted by Tensor, Inc., plus an additional one and one-half years extending beyond the completion of such purchase orders or contracts." The agreement with QSI provides for a

specific term of "a period of ten years beginning 7 August 1991 and ending on 6 August 2001," but could also be terminated by either party on 30 days' notice. Although Tensor continued to abide by the QSI agreement after Tensor merged with QSI, it is undisputed that the QSI agreement terminated in 1998. Under the agreement with QDT, which merged with Tensor in 1998, "[c]ommissions [would] cease to be paid on orders ... following a period of two years wherein no orders are accepted by QDT from that customer or its successors."

In addition to a "continuity" provision, each sales agreement contains a provision that the agreement would be binding on the "successors and assigns" of the Tensor parties. The Agency relied extensively on the "continuity" provisions in claiming that it was entitled to future commissions even after the transfer of assets to Allied Signal. The Agency also relied on the "successors and assigns" terms, as well as the time-period designations in each of the sales agreements, to support the Agency's claim that the Tensor parties' obligations to the Agency continued, even though the Tensor parties ceased to exist after Allied Signal purchased their assets.

### March 31, 1998 Asset Purchase of Tensor by Allied Signal

Allied Signal manufactured instruments that Tensor used in its products. In 1996, Allied Signal began efforts to purchase Tensor's assets. A major difference between the two companies was that Allied Signal did not employ independent sales agents like Asfahl to market its products and relied instead on in-house employees who were either salaried or earned substantially smaller commissions than the Agency earned under the sales agreements with the Tensor parties.

Allied Signal acquired Tensor's assets by an asset-purchase agreement (APA) entitled "Agreement and Plan of Reorganization." The purchase price exceeded $40 million, and the APA was executed on March 31, 1998.[6] Specific provisions of the APA excluded Tensor assets from the assets Allied Signal purchased. Other provisions of the APA specified liabilities and obligations that Allied Signal assumed in the purchase. Allied Signal and Tensor also executed a separate assumption agreement for the liabilities assumed by the APA.

#### A. Assets Excluded by APA

Paragraph 2.2 of the APA governed *"Excluded Assets."* (Emphasis in original.) This paragraph addressed specific Tensor assets that were not conveyed to Allied Signal. Subparagraph (b) of paragraph 2.2 lists, "Those certain Sales Agreements (the *"Asfahl Agreements"*)" and deems them an "Excluded Asset." (Emphasis in original.) The "Agency Agreements" stand out in their specificity, in that the only other Tensor assets listed as excluded are (1) retained cash, subject to provisions of the APA governing final adjustment on the transaction, and (2) the corporate minute book, stock transfer records, and other documents and records of Tensor and its subsidiaries that were not related to the business.

#### B. Liabilities Assumed by APA

Paragraph 4.1 of the APA, entitled *"Assumption of Certain Liabilities and Obligations by Purchaser,"* governed any liabilities of the Tensor parties that Allied Signal, as purchaser, expressly agreed to "assume, promise to pay, and be liable and responsible solely for" in the asset-purchase transaction. (Emphasis in original.) Paragraph 4.1 contains two provisions that are relevant to this lawsuit, as follows:

---

**6.** As stated in paragraph 2.4 of the APA, entitled "C Reorganization," the stated purpose of the transaction and reorganization was to liquidate the Tensor parties completely.

[4.1.](d) [The Tensor parties'] obligations and liabilities relating to **periods on or after the Closing Date** under the Contracts listed in the <u>Contracts Schedule</u> and <u>Real Property Schedule</u> attached hereto. Purchaser will not assume any Contract with an obligation exceeding $100,000 that is not listed on the <u>Contracts Schedule</u>.

. . . .

[4.1](f) [The Tensor parties'] obligations to pay **commissions to Asfahl to the extent accrued or reserved for on the Closing Balance Sheet.**

(Underlined emphasis in original; bolded emphasis added.)

The APA's Supplement to the Contracts Schedule referred to in paragraph 4.1(d) above lists the sales agreements with the Agency. Under the terms of the separate assumption agreement executed concurrently with the APA, Allied Signal agreed to "pay, perform and discharge promptly and fully when due" the liabilities assumed under the APA.

## C. APA Disclaimed Third–Party Rights

Paragraph 17.14 of the APA, entitled "Third Party Rights," disclaimed any rights inuring to others as a result of the APA. Under this paragraph, the provisions of the APA "are for the sole benefit of Purchaser (Allied Signal) and Seller (Tensor) . . . and shall not enure [sic] to the benefit of any other entity or person . . . either as a third[-]party beneficiary or otherwise."

## D. Contentions of the Parties

Although paragraph 2.2(b) of the APA explicitly listed the Agency's sales agreements as "excluded assets," and although neither Asfahl nor the Agency was a party to the APA, the Agency claimed that both

the APA and the terms of the sales agreements entitled the Agency to continuing commissions after Allied Signal purchased Tensor's assets. The Tensor parties and Allied Signal argued that the provisions of the APA excerpted above disclaimed any continuing obligation to pay commissions to the Agency. The Tensor parties also argued that, because their entities and, therefore, their products, ceased to exist after March 31, 1998, the date of the asset purchase, and because they consequently received no payments of any kind after that date, they had no further obligation to the Agency after that date. Allied Signal and the Tensor parties also contended that their interpretation of the APA, which they alone executed, was consistent with article 5.10(B)(2) of the Business Corporation Act, which provides that a disposition of the assets of a corporation does not make the acquiring entity "responsible or liable for any liability or obligation of the selling corporation" that the acquiring entity "did not expressly assume." Tex. Bus. Corp. Act. Ann. art. 5.10(B)(2) (Vernon Supp.2004).

### Verdict and Judgment

The trial court submitted the Agency's case to the jury by a single liability question that inquired whether "any of the Tensor parties fail[ed] to comply with the agreement to pay Charles Asfahl commissions under the sales agreements in question." Having answered "yes" to this question, the jury then determined "what sum of money, if any, . . . would fairly and reasonably compensate Charles Asfahl for his damages, if any, that resulted from [the Tensor parties'] failure to comply." Pursuant to the instruction that accompanied this question, the jury was to limit any award to "unpaid commissions, if any, for the time period from July 20, 1994[7] through *orders received* by the Tensor

---

**7.** July 20, 1994 was the cutoff date for the four-year statute of limitations. *See* Tex. Civ.

parties on or before March 31, 1998."[8] The parties and the trial court referred to these damages as "gap" damages or "gap commissions," whose purpose was to compensate the Agency for sales generated before the asset purchase.

The trial court's limiting liability and damages to gap commissions due to the Agency, and no commissions beyond gap commissions, i.e., beyond the sale of Tensor's assets to Allied Signal, is consistent with the trial court's stated intent to "submit to the jury ... a question that encompasses orders made *prior to* the asset[-]purchase agreement." (Emphasis added.) Limiting liability and damages to gap commissions is also consistent with the trial court's having directed a verdict against the Agency "for all claims for commissions *subsequent to* the asset[-]purchase agreement [and] for all sales of products made *after* the asset[-]purchase date." (Emphases added.) By directing a

verdict against the Agency for post-APA commissions and sales, and thus limiting the Agency's damages to gap commissions, the trial court eliminated any claim of a continuing obligation to the Agency under the sales agreements.

**The Agency's Challenges to Directed Verdict and to Jury Charge Limiting Damages for Unpaid Commissions to Orders Tensor Received before Asset–Purchase Date**

In its first two points of error, the Agency contends that the trial court erred by granting a directed verdict and refusing to submit issues to the jury for post-APA damages. In the first point of error, the Agency contends that Allied Signal expressly assumed the Tensor parties' commission obligations to the Agency and alternatively, in the second point of error, contends that the APA did not terminate the Tensor parties' commission obligations. We address these points together.[9]

---

PRAC. & REM.CODE ANN. § 16.004(a) (Vernon 2002). The trial court directed a verdict against the Agency for all claims based on all invoices that predated the filing date of this lawsuit by four years. The Agency has not challenged that ruling on appeal.

8. Whether to frame the damages question in terms of "orders received," which the trial court ultimately chose, or in terms of "orders invoiced," engendered significant controversy in the charge conferences. Instructing the jury to consider only "orders invoiced" would have required completed manufacture and readiness to ship to the buyer and, thus, actual invoicing, before a commission would become due to the Agency. "Orders invoiced" would not only have produced significantly less damages, but would have been much easier to support in some exhibits, which did not clearly reflect dates on which orders were "received."

9. We note further that we address these issues on the merits of the directed verdict, rather than as challenges to the pretrial summary judgment rendered against the Agency, as Allied Signal proposes. *See, e.g., City of Hous-*

*ton v. Socony Mobil Oil Co.,* 421 S.W.2d 427, 430 (Tex.Civ.App.-Houston [1st Dist.] 1967, writ ref'd, n.r.e.) (holding that pretrial summary judgment merges with final judgment and thus becomes reviewable on appeal); *see also Krenek v. Texstar N. A., Inc.,* 787 S.W.2d 566, 570 (Tex.App.-Corpus Christi 1990, writ denied) (holding that, although summary judgment was interlocutory when rendered, issues resolved by motion were final, thus precluding discovery on those issues); *see also Newco Drilling Co. v. Weyand,* 960 S.W.2d 654, 656 (Tex.1998) (stating general rule that interlocutory summary judgment is final as to issues addressed when rendered and becomes final and appealable when merged into final judgment). The record reflects that the Agency amended its pleadings after the trial court rendered the summary judgment, and, moreover, that the trial court reconsidered the issue on the merits in directing a verdict and refusing to submit any claims of future damages to the jury. Although the issue was thus essentially relitigated, no party has challenged the trial court's action on that ground. *See Newco Drilling Co.,* 960 S.W.2d at 656; *Socony,* 421 S.W.2d at 430.

A directed verdict is proper in the following circumstances: (1) a defect in the opponent's pleading renders that pleading insufficient to support a judgment; (2) the evidence conclusively proves facts that establish the movant's right to judgment under the substantive law; or (3) the evidence is legally insufficient to raise a fact issue on a proposition that the nonmovant must establish to be entitled to judgment. *Smith v. Radam, Inc.,* 51 S.W.3d 413, 417 (Tex.App.-Houston [1st Dist.] 2001, no pet.). A directed verdict is properly rendered in favor of a defendant when the plaintiff does not present evidence that raises a fact issue essential to the plaintiff's right of recovery or when the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. v. Fin. Review Servs.,* 29 S.W.3d 74, 77 (Tex.2000). Well-settled standards require that we review a directed verdict in the light most favorable to the party who suffered the ruling and disregard all contrary evidence and inferences. *See Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303–04 (Tex.1988); *Smith,* 51 S.W.3d at 417.

We apply a similar standard to the Agency's complaint that the trial court erred by refusing to submit damages questions to the jury for post-APA damages. Rule 278 requires trial courts to submit broad-form questions raised by the "pleadings and evidence." TEX.R. CIV. P. 278; *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex. 1992). If a controlling issue is timely raised by pleadings and evidence and properly requested to be included in the charge, refusal to submit a valid theory of recovery or a valid defense may constitute reversible error. *Exxon Corp. v. Perez,* 842 S.W.2d 629, 631 (Tex.1992). Whether legally sufficient evidence supports submitting a theory of recovery to the jury presents a question of law that we review de novo based on the pleadings, the evidence

and the charge as a whole. *See Elbaor,* 845 S.W.2d at 243.

To the extent that the Agency's issues require interpretation of the sales agreements and the APA, we interpret these contracts as a matter of law under established rules of interpretation. *See Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983) (recognizing that court properly construes written instrument as a matter of law if it can be given a certain or definite meaning and is therefore not ambiguous; further holding that existence of ambiguity is question of law); *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133–34 (Tex.1994) (requiring that court construing contract give effect to all provisions and that specific provisions control over more general provisions).

Our analysis of these issues necessarily begins by recognizing the type of transaction by which Allied Signal acquired the entities of the Tensor parties. This transaction was an asset transfer, as opposed to a stock transfer, and thus governed by Texas law authorizing a successor to acquire the assets of a corporation without incurring any of the grantor corporation's liabilities unless the successor expressly assumes those liabilities. The Business Corporation Act provides as follows:

> A disposition of any, all, or substantially all, of the property and assets of a corporation ... except as otherwise expressly authorized by another statute, does not make the acquiring corporation, foreign corporation, or other entity responsible or liable for any liability or obligation of the selling corporation that the acquiring corporation, foreign corporation, or other entity did not expressly assume.

TEX. BUS. CORP. ACT. ANN. art. 5.10(B)(2) (Vernon 2003). *See Suarez v. Sherman Gin Co.,* 697 S.W.2d 17, 20–21 (Tex.App.-Dallas 1985, writ ref'd, n.r.e.) (contrasting

stock and asset-purchase cases decided under pre-article 5.10(B)(2) law); *see also* *Lockheed Martin Corp. v. Gordon,* 16 S.W.3d 127, 139–40 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) ("Texas strongly embraces the non-liability rule."). Even if the Agency's sales and marketing agreements with the Tensor parties purported to bind their "successors and assigns," therefore, the agreements could not contravene the protections that article 5.10(B)(2) afforded Allied Signal in acquiring the assets of the Tensor parties unless Allied Signal expressly agreed to be bound by the Tensor parties' agreements with the Agency.

■ According to paragraph 2.2 of the APA, assets identified as excluded were "not intended to be *sold, assigned, transferred or conveyed* " to Allied Signal. (Emphasis added.) Paragraph 2.2(b) of the APA identifies the Agency sales agreements as "excluded" from the Tensor assets transferred to Allied Signal. In addition to benefitting the Agency, sometimes to the extent of a 10 percent commission, the sales agreements necessarily benefitted the Tensor parties and were thus properly considered "assets." Because the APA excluded the Agency agreements as assets transferred to Allied Signal and also expressly disclaimed assignment of those agreements, Allied Signal could not obtain any post-APA benefit that had previously accrued to the Tensor parties from the Agency's marketing. In contrast to the trial court, we discern no preliminary "conflict" between considering the sales agreements with the Agency as both "assets" and "liabilities." [10]

Moreover, paragraph 4.1(f) of the APA is also very specific, in two respects, concerning the sales agreements that Allied Signal assumed. Although paragraph 4.1(f) recognizes liabilities to the Agency as assumed liabilities, paragraph 4.1(f) *limits* Allied Signal's responsibility to commissions "*accrued or reserved for* on the Closing Balance Sheet" for the asset-purchase transaction. (Emphasis added.) This limitation recognizes continuing liability for commissions due to the Agency for sales generated up to the March 31, 1998 asset transfer to Allied Signal. Acknowledging these gap commissions is also consistent with the reality of how the Tensor parties' sales were completed. It is undisputed that significant time frequently elapsed between the Agency's initially placing orders for buyers that the Agency supplied and the Tensor parties' finally completing those orders because the machines that the Tensor parties produced were typically customized to meet buyers' differing, specific requirements. Considerable delay often resulted, therefore, between the Agency's placing orders for machinery with the Tensor parties and actual invoicing of those orders by the Tensor parties.[11]

The Agency's arguments minimize the importance of paragraph 4.1(f) and focus instead on paragraph 4.1(d) of the APA. Paragraph 4.1(d) recognizes obligations "relating to periods *on or after* the Closing Date under the Contracts listed in the Contracts Schedule" as assumed liabilities. (Emphasis added.) The Agency also relies on an amendment to the Contracts Schedule, which identifies the sales agreements.

---

10. The trial court construed paragraph 2.2(b), which listed the sales agreements as excluded assets, as conflicting with paragraph 4.1(f), which addressed assumed liabilities, on the grounds that the sales agreements could not be both an asset and a liability. We disagree for the reason stated—the agreements produced profit and income to the Tensor parties and were therefore assets to that extent.

11. These acknowledged delays may best explain the "continuing obligation" clauses for specific time periods in the three sales agreements.

The Agency contends that the broad reference to periods beyond the closing date, taken together with the specific listing of the sales agreements in the contract schedule, compel the conclusion that the obligations under the sales agreements continued after Allied Signal's purchase of the Tensor entities.

We agree with the trial court that the express, specific limitation in paragraph 4.1(f) for "obligations to pay commissions to Asfahl to the extent accrued or reserved for on the Closing Balance Sheet" is, under well-settled rules of contract interpretation, a specific provision that controls over the more general recognition of "after the Closing Date" obligations in paragraph 4.1(d). *See Forbau*, 876 S.W.2d at 133–34. Despite perceiving a conflict between listing the Agency agreements as both an asset and a liability, the trial court relied extensively on the "specific controls the general" rule of contract interpretation in concluding that paragraph 4.1(f)'s restriction to "accrued" obligations, or those reserved for on the closing balance sheet, controlled over the post-closing date recital in paragraph 4.1(d). Thus, the trial court concluded, and we hold, that paragraph 4.1(d) of the APA did not permit the Agency to recover for post-APA sales.

We construe paragraphs 4.1(d) and 4.1(f) of the APA as consistent with the Tensor parties' and Allied Signal's having expressly excluded the Agency agreements as profit-producing assets transferred to Allied Signal pursuant to paragraph 2.2(b). Taken together, paragraphs 4.1(d) and (f) reflect that the Tensor parties and Allied Signal acknowledged the delay, or "gap," that undisputedly occurred between the Agency's placing an order from a sale that the Agency generated and payment for the product by the customer, after which the Agency would receive a commission.

Paragraphs 4.1(d) and (f) likewise acknowledge that Tensor ceased to exist after the asset-purchase transfer to Allied Signal. Having transferred its assets and having committed to wind up its affairs, Tensor would have no free assets to compensate the Agency for gap commissions due. Liabilities to the Agency for gap commissions, however, necessarily continued. As gap commissions became due for payment to the Agency, they would (1) necessarily be reflected in Tensor's accounting and would thus be shown as "accrued or reserved for" on the closing balance sheet, but also (2) necessarily be reflected as a contract for which obligations were due after the closing date under paragraph 4.1(d) and thus listed in the contracts schedule, as the Agency agreements were.

Consistent with the Agency agreements' having been excluded as acquired assets, Allied Signal's liability to "assume, promise to pay, and be liable and responsible for" the Tensor parties' obligations, was necessarily a limited liability. Specifically, Allied Signal agreed to pay gap commissions owed to the Agency for sales that were generated up to March 31, 1998, the date of the asset purchase, and were thus reflected as due to the Agency on the closing balance sheet, but which would not have been paid by the Tensor customer by that date and would thus reflect a commission due to the Agency after that date.

The Assumption Agreement, which Allied Signal executed in favor of the Tensor parties as part of the March 31, 1998 asset purchase, does not change this analysis because the liabilities assumed are those encompassed by the entirety of paragraph 4.1, which necessarily includes paragraph 4.1(f)'s narrow limitation of liabilities assumed to those "accrued or reserved for on the Closing Balance Sheet." Likewise, we are not persuaded that the testimony of Cynthia Bast, Allied Signal's attorney for the asset-purchase transaction, compels a

different interpretation of the contract than we have reached here. According to Bast, the "on or after the Closing Date" provisions of paragraph 4.1(d), taken together with the listing of the Agency agreements as an addendum to the contracts schedule, created an assumption of liability for the Agency agreements after March 31, 1998. This testimony isolates these two provisions and thus does not encompass, as the trial court did, and we must, the entirety of the APA. Accordingly, Bast's testimony did not give rise to a disputed issue of fact to defeat the Tensor parties' and Allied Signal's right to a directed verdict limiting any damages due to the Agency to orders Tensor received before the asset-purchase transaction.

We overrule the Agency's first and second points of error.

### TSRA Treble Damages—Challenges by the Agency and the Tensor Parties[12]

In its third point of error, the Agency challenges two rulings by the trial court under the Sales Representative Act (TSRA), TEX. BUS. & COM.CODE ANN. §§ 35.81–86 (Vernon 2002). The Tensor parties also challenge the trial court's TSRA rulings. The Agency contends that it is entitled to trebling on all damages, rather than a mere percentage of damages, because all of its sales were "wholesale" sales. In their third issue, the Tensor parties contend that trebling is improper as a matter of law because there is no evidence that the Agency had any "wholesale" sales. We address the Agency's and the Tensor parties' contentions together.

TSRA was enacted to protect "sales representatives." *Metromarketing Servs., Inc. v. HTT Headwear, Ltd.,* 15 S.W.3d 190, 195 (Tex.App.-Houston [14th Dist.] 2000, no pet.).[13] It is undisputed that the Tensor parties were "principals" within the meaning of the TSRA: they (1) manufactured products for sale, (2) used the Agency as their commissioned sales agent to solicit orders for those products, and (3) compensated the Agency by paying commissions. *See* TEX. BUS. & COM.CODE ANN. § 35.81(2)(A)-(C). Although no one contests that the Agency was a commissioned sales agent for the Tensor parties, the parties vigorously dispute whether the Agency was entitled to recover under the treble-damages provisions of TSRA.

TSRA defines "sales representative" as an independent contractor who solicits orders on behalf of a principal for wholesale purchase of the principal's product. *See* TEX. BUS. & COM.CODE ANN. § 35.81(3). Section 35.84 permits a sales representative to recover three times the amount of unpaid commissions, plus attorney's fees and costs, if the principal fails to comply with a contract, under section 35.82, or fails to pay a commission, as required by section 35.83. TEX. BUS. & COM.CODE ANN. § 35.84. Section 35.84 provides as follows:

A principal who fails to comply with a provision of a contract under Section 35.82 relating to a payment of a commission or fails to pay a commission as required by Section 38.83 is liable to the sales representative in a civil action for three times the unpaid commission sustained by the sales representative plus reasonable attorney's fees.

---

12. Allied Signal did not respond to the Agency's third point of error.

13. TSRA consists of the following subsections: definitions (of "commission," "principal," and "sales representative"), requirements for contracts subject to the TSRA, provisions for payment of commissions under compensation agreements not in compliance with the TSRA, damages, jurisdiction, and a prohibition against waiver. TEX. BUS. & COM.CODE ANN. §§ 35.81–.86 (Vernon 2002).

Tex. Bus. & Com.Code Ann. § 35.84. The trial court submitted the TSRA issue to the jury in question 3 of the court's charge.

In response to question 2 of the charge, the jury assessed $906,793.90 as damages for the Tensor parties' failure to comply with the sales agreements with the Agency. Question 3 of the charge directed the jury to answer the following if an amount of damages were awarded in response to question 2:

> What percentage of the amount that you found in answer to Question No. 2 were commissions from wholesale sales?
>
> "Wholesale" is the sale of goods in quantity for resale, either separately or as a component.[14]
>
> Answer by stating a percentage: ____.

The jury answered, "28.6%."

In accordance with the 28.6 percentage found by the jury, the judgment of the trial court awarded the Agency $518,686.10 as trebled damages pursuant to section 35.84 of TSRA. The Agency challenges the trial court's refusal to set aside the jury's 28.6 percentage finding and the trial court's resulting refusal to treble the entire $906,793.90 amount that the jury awarded in response to question 2. The Tensor parties contend that section 35.84 does not apply and that trebled damages were improper as a matter of law.

## A. The Agency's Challenge

The Agency contends that, despite the jury's answer to question 3, it is entitled to trebling on the entire $906,793.90 awarded by the jury as damages in response to question 2. The Agency premises its appellate contention on two rulings by the trial court. In the first ruling, the trial court refused to set aside, as immaterial, the jury's finding, in response to question 3, that 28.6 percent of the damages that the jury awarded were attributable to wholesale sales. In accordance with that ruling, the trial court entered the second challenged ruling, which overruled the Agency's motion seeking entry of a judgment awarding trebled damages on the entire $906,793.90 awarded by the jury for the Tensor parties' failure to comply with the sales agreements. Because the second ruling necessarily followed the first ruling, we construe the Agency's third point of error as a challenge to the trial court's refusal to set aside the jury's answer to question 3 on the grounds of immateriality.

A trial court may disregard a jury finding only if it should not have been submitted or it is immaterial. *Southeastern Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex.1999). A jury finding is immaterial when the question to which the finding responds (1) should not have been submitted, (2) calls for a finding beyond the province of the jury, such as a question of law, or (3), was properly submitted, but the jury's answers to other questions render the finding meaningless. *See id.*

The Agency asserts that the TSRA mandates trebling of any damages awarded for unpaid commissions as a matter of law, regardless of whether the commissions were attributable to wholesale sales, and

---

**14.** The definition may derive from *Power Clearinghouse, Inc. v. Pub. Util. Comm'n,* 968 S.W.2d 537, 539 (Tex.App.-Austin 1998, no pet.). Like TSRA, the Utilities Code does not define "wholesale." *See id.* In affirming the Public Utility Commission's conclusion that the proposed sale was not a wholesale transaction, the Austin Court of Appeals relied on common definitions of the word "wholesale." *Id.; see* Tex. Gov't Code Ann. § 311.011(a)-(b) (Vernon 1998) (requiring that words and phrases be read in context, construed according to rules of grammar and common usage, and that words that have acquired technical or particular meaning be construed accordingly). These definitions comprised the two elements included in the definition of wholesale sales in question 3 of the charge—those sold (1) in quantity and (2) for resale.

that the trial court should, therefore, have (1) granted the Agency's motion to disregard the jury's finding that 28.6 percent of the Agency's commissions were attributable to wholesale sales and (2) should have granted the Agency's motion seeking trebled damages for all unpaid commissions. In moving to set aside the jury's finding that 28.6 percent of the damages awarded were from "wholesale sales," the Agency argued that the finding was immaterial and that question 3 "should never have been submitted to the jury" because any percentage allocation to wholesale sales was irrelevant and invaded determination of the legal question that the Agency was entitled to trebling on all damages as a matter of law. The Agency thus contends that the trial court, rather than the jury, should have determined the TSRA issue. Accordingly, the Agency's challenge to the trial court's failure to set aside the jury's finding of 28.6 percent wholesale sales falls into the first and second categories of immateriality. *See id.*

To preserve a complaint premised on the jury charge for appellate review, a party must, at the risk of waiver, (1) present to the trial court a timely request, motion, or objection; (2) state the specific ground; and (3) obtain a ruling. Tex.R.App. P. 33.1(a); *see In re B.L.D.*, 113 S.W.3d 340, 349 (Tex.2003).[15] Requiring parties to preserve error conserves judicial resources, by allowing the trial court to correct an error before an appeal proceeds, and promotes fairness among litigants. *In re B.L.D.*, 113 S.W.3d at 350 (citing and quoting from *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex.1982)); *see also id.* at 354 (rejecting contention that due process concerns compel court of appeals to address unpreserved error in termination of parental-rights cases); *In re A.V.*, 113 S.W.3d 355, 358 (Tex.2003) (confirming same).

■ A party fails to preserve error in the jury charge when that party waives, or invites, the alleged error by acquiescing to submitting a theory that the party later claims is erroneous. *See* 34 T. Ray Guy, The Jury Charge in Texas Civil Litigation: Texas Practice Series § 9.27 at 147 (3d ed.2003). Similarly, a party waives claimed error in the charge when that party proposes to submit a substantially similar charge to the jury. *See Maddox v. Denka Chem. Corp.*, 930 S.W.2d 668, 670 (Tex.App.-Houston [1st Dist.] 1996, no writ); *Winkle v. Tullos*, 917 S.W.2d 304, 316 (Tex.App.-Houston [14th Dist.] 1995, writ denied); *see also Williams v. Vought*, 68 S.W.3d 102, 115 (Tex.App.-Dallas 2001, no pet.) (following *Maddox* and holding same).

■ Despite postverdict complaints that question 3 should never have been submitted to the jury at all and that the trial court should have awarded treble damages on the entire $906,793.90 as a matter of law, the Agency did not object to question 3, which asked the jury to determine the percentage of wholesale sales. Instead, the Agency merely lodged a three-pronged objection to the definition of "wholesale" *within* the question.[16] The es-

---

**15.** The only exception to the preservation requirement is fundamental error, which no one asserts here. *See In re B.L.D.*, 113 S.W.3d 340, 350 (Tex.2003).

**16.** The Agency's complete objection is as follows:

. . . [The Agency] objects to the definition of wholesale as that word is not defined by the [TSRA] and frankly we think the legislature was just sloppy and it should not be included there at all.

Secondly, our second position is that if [the Agency] made one wholesale sale, then all of his unpaid commissions should qualify.

And third, since it's a word with common meaning, we don't believe there should be any definition given to the jury on the meaning of wholesale since that will re-

sence of these objections is that, although the Agency objected to the court's defining "wholesale" for the jury, the Agency did not object to submitting the question itself and thus acquiesced to asking the jury to determine the percentage of wholesale sales. In sharp contrast to its postverdict contention that question 3 should never have been submitted, the Agency did not oppose and actually embraced, as explained below, the jury's determining the percentage of wholesale sales, although the Agency would have preferred a different definition of "wholesale" or no definition at all.

The record reflects that the Agency strongly favored submitting TSRA issues to the jury, albeit in a different manner than that chosen by the trial court. The Agency proposed to submit the TSRA issues to the jury by a single question that would have asked the jury to determine whether the Agency was a "sales representative" for either the Tensor parties or Allied Signal. But the Agency's tendered question, which the trial court marked "refused," would also have required the jury to determine whether the Agency made wholesale sales. An instruction accompanying the Agency's proposed question would have defined "sales representative" as follows: " 'Sales representative' means an independent contractor who solicits[,] on behalf of a principal[,] orders for the purchase *at wholesale* of the principal's product." (Emphasis added.) Under both the charge as submitted and the charge proposed by the Agency, therefore, the jury would determine the underlying issue of wholesale sales. Having proposed that the jury determine the issue of wholesale sales, the Agency could neither properly ask the trial court to disregard the jury's finding as immaterial nor properly contend

that the jury should never have been asked to determine that issue. *See Maddox,* 930 S.W.2d at 671. For the same reasons, the Agency may not assert those challenges on appeal. *See id.*

We conclude that the Agency did not preserve error because the Agency did not timely assert any challenge to the court's charge, which allowed the jury to determine what percentage of the Agency's sales were attributable to wholesale sales, and therefore waived any error pertaining to either the trial court's denying the Agency's motion to disregard the jury's finding as immaterial or the Agency's motion seeking entry of a judgment trebling all damages.

We overrule the Agency's third point of error.

## B. The Tensor Parties' Challenge

In their third issue, the Tensor parties contend that TSRA's treble-damages provision, section 35.84, applies only to wholesale sales. They argue that there is no evidence that the Agency made any wholesale sales and that trebling was improper as a matter of law. They ask that we vacate the treble-damages award of $518,686.10. Well-settled standards govern our standard and scope of review of the Tensor parties' "no-evidence" challenge. *E.g., Lenz v. Lenz,* 79 S.W.3d 10, 19 (Tex.2002); *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 24–25 (Tex.1994).

A legal-sufficiency challenge may be preserved by a motion for directed verdict, a motion for judgment notwithstanding the verdict, an objection to submitting an issue to the jury, a motion to disregard a jury finding on an issue, or a motion for new trial. *See Cecil v. Smith,* 804 S.W.2d 509, 511 (Tex.1991).[17] Here,

strain them from being able to consider possibly every sale.

17. Accordingly, we reject the Tensor parties' reliance on their trial brief on the TSRA claim as having preserved their challenge.

the Tensor parties preserved their challenge in their post-verdict motion for judgment notwithstanding the verdict, in which they challenged the legal sufficiency of the evidence to support recoverability of treble damages under question 3 of the jury charge. *See Holland v. Wal–Mart Stores,* 1 S.W.3d 91, 94 (Tex.1999) (holding that postverdict motion for judgment notwithstanding the verdict preserved error because objecting party challenged recoverability of attorney's fees under legal theory submitted to jury).

■■■ As addressed above, question 3 of the court's charge asked the jury "what percentage" of damages awarded for the Tensor parties' failure to comply with the sales agreement was attributable to wholesale sales, which the charge defined as, "the sale of goods in quantity for resale, either separately or as a component." Although Asfahl described all of his sales as "wholesale," his testimony does not encompass evidence that the sales he described met both components of the "wholesale" definition, specifically, that the sales were made (1) in quantity and (2) for resale. The voluminous records of the Agency's sales do indicate some sales in quantity; likewise, some records reflect sales for resale. But, the record before us contains no evidence that the Agency commissioned sales for the Tensor parties that qualified as both (1) in quantity and (2) for resale. Because there was no evidence of wholesale sales, as defined by the jury charge, we hold that the trial court erred by denying the Tensor parties' motion for judgment notwithstanding the verdict, which challenged the jury's finding that 28.6 percent of damages were for wholesale sales. That finding should have been set aside and the $518,686.10 awarded by trial court's judgment as treble damages in accordance with that finding must also be set aside.

We sustain the Tensor parties' third issue.

## Fraudulent Transfer Claim against the Tensor Parties and Allied Signal

In its fifth point of error, the Agency contends that the trial court erred by (1) rendering summary judgment in favor of the Tensor parties and Allied Signal on the Agency's claim that the Tensor parties' sale of its assets constituted a fraudulent transfer that violated the Uniform Fraudulent Transfer Act (UFTA) and (2) refusing to submit that claim to the jury. *See* TEX. BUS. & COM.CODE ANN. §§ 24.001–.013 (Vernon 2002). We decline to address the latter contention because the record does not show that the Agency proposed submitting a fraudulent-transfer question to the jury. We therefore limit our review to the summary judgment granted on the Tensor parties' and Allied Signal's joint motion for summary judgment, which became merged with the final judgment challenged here. *See Newco Drilling Co. v. Weyand,* 960 S.W.2d 654, 656 (Tex.1998); *State Farm Fire & Cas. Co. v. Griffin,* 888 S.W.2d 150, 153 (Tex.App.-Houston [1st Dist.] 1994, no writ); *City of Houston v. Socony Mobil Oil Co.,* 421 S.W.2d 427, 430 (Tex.Civ.App.-Houston [1st Dist.] 1967, writ ref'd, n.r.e.). Our scope of review is limited to the summary-judgment record upon which the trial court based its ruling, *see Griffin,* 888 S.W.2d at 153, and we review the summary judgment according to well-settled standards. *See* TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985).

■■■ UFTA proscribes certain transfers by a "debtor," which the act defines as "a person who is liable on a claim." TEX. BUS. & COM.CODE ANN. § 24.002(6). The purpose of UFTA is to prevent debtors from placing property beyond the reach of creditors with intent to defraud

those creditors. *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex.App.-Houston [1st Dist.] 2002, no pet.). UFTA creates a statutory cause of action by which an aggrieved creditor may seek recourse for fraudulent transfer of assets. *Id.* A transfer by a debtor may be fraudulent as to either a present or future creditor if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation. . . .

TEX. BUS. & COM.CODE ANN. § 24.005(a)(1)-(2). The Agency's pleadings alleged that the asset purchase by which Allied Signal acquired the assets of the Tensor parties violated both prongs of section 24.005(a). The summary-judgment record indicates that, in moving for summary judgment, the Tensor parties and Allied Signal relied on the terms of the APA and the affidavits of their respective principals.

■■■ As addressed in our analysis of the Agency's first and second points of error and as demonstrated by the summary-judgment record, Allied Signal acquired the assets of the Tensor parties pursuant to the APA and in accordance with article 5.10(B)(2) of the Business Corporation Act. *See* TEX. BUS. CORP. ACT ANN. art. 5.10(B)(2). The APA excluded the Agency agreements from the assets transferred to Allied Signal and expressly disclaimed assignment of those agreements to Allied Signal. Because the Tensor parties ceased to exist after their assets were transferred under the APA, the Agency had no right to future commissions from those creditors, despite the "continuity" provisions of the sales agreements. Because the APA excluded the Agency agreements from the assets Allied Signal acquired, the Agency had no right to future commissions from Allied Signal. The summary-judgment record established, as we have also held above, that the Agency was not a "future" creditor as to either Allied Signal or the Tensor parties as a matter of law. The Agency's status was thus limited to that of a "present" creditor and any recovery was limited to "gap" commissions that remained unpaid as of the date of the asset purchase.

In moving for summary judgment on the Agency's claim that the transfer of the Tensor parties' assets to Allied Signal violated UFTA section 24.005(a)(1) because it was with made to avoid paying commissions that were owed to the Agency and thus with actual intent to hinder, delay, or defraud the Agency, Allied Signal and the Tensor parties contended that the question of fraudulent intent presented a question of law in this case. *See Connell v. Connell*, 889 S.W.2d 534, 542 (Tex.App.-San Antonio 1994, writ denied) (holding that courts may resolve issue of fraudulent intent as a matter of law when evidence establishes that conveyance was not made with fraudulent intent and no evidence tends to connect grantee with any intent to defraud). We agree.

In addition to relying on the terms of the APA, none of which discloses or suggests a fraudulent intent, the Tensor parties and Allied Signal provided sworn and documentary proof that disclaimed all but one of the factors, or "badges of fraud," listed in section 24.005 as possible indicators of fraudulent intent by a debtor. *See* TEX. BUS. & COM.CODE ANN. § 24.005(b)(1)-(11); *Tel. Equip. Network*, 80 S.W.3d at 607.[18] The Tensor parties and Allied Sig-

---

**18.** UFTA lists 11, non-exhaustive "badges of fraud" to assist in determining whether a debtor made a transfer with the requisite fraudulent intent. TEX. BUS. & COM.CODE ANN. § 24.005(b)(1)-(11). These include whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or con-

nal emphasized that the negotiated purchase price for the transfer of net assets far exceeded the amount of any commissions owed to the Agency and further emphasized that Allied Signal expressly assumed the Tensor parties' obligation to pay commissions due to the Agency "to the extent accrued or reserved for" on closing. Allied Signal and the Tensor parties conceded the fifth factor listed in section 24.005(b), that the assets transferred constituted all Tensor assets, but contended that this factor did not give rise to any triable issue of fact on fraudulent intent because the transfer was statutorily authorized, completely within the law, and an undisputedly frequent business occurrence.

Aside from other legal contentions that did not dispute the Tensor parties' and Allied Signal's entitlement to summary judgment as a matter of law under UFTA section 24.005(a)(1), the Agency's response in the trial court focused, as here, on the contention that the Tensor parties never received the negotiated consideration for the asset-purchase because the purchase price was paid to their shareholders in the form of stock certificates. The Agency contends that this left the Tensor parties in the status of a creditor that had passed funds through to others to avoid payment.

The Agency's perception of the transaction ignores several aspects of the asset-purchase transaction that contemplate Allied Signal's and the Tensor parties' recognition of pending obligations. All of these aspects are reflected on the face of the APA. First, the APA indicates payment to the Tensor parties, despite ultimate transfer of stock certificates to the shareholders. In addition, the stated purpose of the transaction was a "C Reorganization" that would completely liquidate the Tensor parties and thus, appropriately, leave it ultimately empty of assets. Next, the Agency's contention that the transfer left the Tensor parties bereft of assets with which to pay commissions due ignores that the stock certificates transferred to shareholders represented the Tensor parties' "net" assets. The Business Corporation Act defines "net" assets as "the amount by which the total assets of a corporation *exceed the total debts* of the corporation." TEX. BUS. CORP. ACT ANN. art. 1.02.A.(19) (Vernon 2003). (Emphasis added.) The APA thus recognized the Tensor parties' obligation for debts not expressly assumed by Allied Signal. In similar manner, the APA compelled Tensor to "work to settle its affairs" following the closing of the sale, which would necessarily contemplate paying debts. Finally, Allied Signal expressly assumed liability under the APA to pay commissions due to the Agency to the extent accrued or reserved for on the closing balance sheet.

We conclude that the summary judgment record establishes that the Agency raised *no* triable fact issues to defeat the Tensor parties' and Allied Signal's entitlement to summary judgment as a matter of

---

trol of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. TEX. BUS. & COM.CODE ANN. § 24.005(b)(1)-(11); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 607–08 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

law against the Agency's claim that the asset-purchase was a fraudulent transfer under section 24.005(a)(1) of UFTA.

Concerning the Agency's allegations that the asset-purchase was a fraudulent transfer under section 25.005(a)(2) because the Tensor parties did not receive reasonably equivalent value, the Agency did not dispute that Allied Signal paid over $40 million to acquire the Tensor parties' assets, but again relied on the stock certificates ultimately issued to the Tensor parties' shareholders. In opposing summary judgment, the Agency argued that the stock certificates issued to shareholders raised a triable issue of fact concerning whether the Tensor parties received reasonably equivalent value in exchange for transferring their assets to Allied Signal. For the same reasons stated in rejecting the Agency's challenge to the summary judgment in favor of the Tensor parties and Allied Signal on the Agency's claim of fraudulent transfer under section 24.005(a)(1) of UFTA, we reject the Agency's reliance on the certificates here. We hold that the trial court properly rendered summary judgment against the Agency on its section 24.005(a)(2) claim.

We overrule the Agency's fifth point of error.

## Tortious Interference Claim against Allied Signal

In its fourth point of error, the Agency contends that the trial court erred by directing a verdict in favor of Allied Signal on the Agency's claim that Allied Signal's purchase of the Tensor parties' assets constituted a tortious interference with the Agency's sales agreements with the Tensor parties. The standard of review for a directed verdict rendered in favor of a defendant, which we applied in addressing the Agency's first point of error, also controls this challenge. *See Prudential Ins. Co.*, 29 S.W.3d at 77.

To warrant submitting the Agency's claim of tortious interference to the jury, the evidence had to raise triable issues of fact on each of the following elements: (1) the existence of a contract subject to interference, (2) a willful and intentional act of interference with that contract, (3) which proximately caused damage to the Agency; and (4) actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex.2002). Even if a plaintiff has established all elements of a tortious-interference claim, however, a defendant may nevertheless prevail by establishing that its conduct was justified or privileged. *See Prudential Ins. Co.*, 29 S.W.3d at 77–78. A defendant can avoid liability by establishing this defense through evidence demonstrating that its action with respect to the contract allegedly interfered with was premised on a legal right. *See id.* at 78. In addition to claiming that the Agency made no preliminary showing sufficient to defeat a motion for directed verdict on its claim that Allied Signal tortiously interfered with the Agency's sales agreements with the Tensor parties, Allied Signal also asserted that its acquisition of the Tensor parties' assets was authorized by article 5.10(B)(2) of the Business Corporation Act and was therefore justified. *See* TEX. BUS. CORP. ACT ANN. art. 5.10(B)(2).

The record reflects the trial court's firm conviction that, in purchasing the assets of the Tensor parties, Allied Signal was pursuing its legal right, guaranteed by article 5.10(B)(2), to acquire only assets without incurring any liabilities of the acquired entities unless Allied Signal expressly assumed those liabilities. To the trial court, article 5.10(B)(2) created "a type of privilege" in Allied Signal that precluded any claim by the Agency that Allied Signal tortiously interfered with the Agency's sales agreements with the Ten-

sor parties in seeking to acquire only their assets. Accordingly, we assume, for purposes of argument only and without deciding that issue, that the Agency made a preliminary showing of the elements necessary to prevail on its tortious-interference claim and we address whether Allied Signal sufficiently established its justification defense to warrant a directed verdict in its favor.

Article 5.10(B)(2) of the Business Corporation Act, set out in full above, provides that a disposition of the assets of a corporation does not make the acquiring entity "responsible or liable for any liability or obligation of the selling corporation" that the acquiring entity "did not expressly assume." *Id.* Well-settled law supports the successor non-liability rule of asset acquisition. *See Lockheed Martin Corp.*, 16 S.W.3d at 139–40; *see also Shapolsky v. Brewton*, 56 S.W.3d 120, 137–38 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (applying non-liability rule in context of holding that contacts of predecessor corporation with Texas forum could not be attributed to successor to serve as basis for asserting personal jurisdiction). As addressed above, even if the "continuity provisions" of the Agency's sales and marketing agreements with the Tensor parties purported to bind their "successors and assigns," those agreements could not contravene the protections that article 5.10(B)(2) afforded Allied Signal in acquiring the assets of the Tensor entities unless Allied Signal expressly agreed to be bound by the Agency agreements.

The Agency disputes Allied Signal's right to prevail on its justification defense for two reasons. The Agency relies first on article 5.10(B)(2)'s exception to the non-liability rule for liabilities that the acquiring entity has expressly assumed. *See* TEX. BUS. CORP. ACT ANN. art. 5.10(B)(2). As addressed in our discussion of the Agency's first and second points of error,

the APA excluded the Agency agreements from the assets Allied Signal acquired, and Allied Signal assumed no liabilities under those agreements except to the extent accrued or reserved for on the closing balance sheet.

The Agency also disputes Allied Signal's justification defense on the grounds that the asset-purchase constituted a fraudulent transfer under UFTA. We rejected the Agency's reliance on both prongs of UFTA in overruling the Agency's fifth point of error, which challenged the trial court's directing a verdict in favor of the Tensor parties and Allied Signal on that claim.

From the authorities that the Agency relies on in support of this and other issues, however, we discern the Agency's contention that the asset-purchase was fraudulent under UFTA because the successor, Allied Signal, was a "mere continuation" of the Tensor parties. The Agency relies on *Phippen v. Deere & Co.* 965 S.W.2d 713 (Tex.App.-Texarkana 1998, no writ), and *Griggs v. Capitol Machine Works, Inc.*, 690 S.W.2d 287 (Tex.App.-Austin 1985), *writ ref'd n.r.e. per curiam*, 701 S.W.2d 238 (Tex.1985), to support these contentions. *Phippen* upheld a successor corporation's liability for a predecessor's debts on the grounds that the successor was a "mere continuation" of the predecessor. 965 S.W.2d at 726. *Griggs* recognized the "mere continuation" theory as an exception to the rule of successor non-liability. *See* 690 S.W.2d at 290 n. 1. As addressed below, we decline to follow *Phippen* and *Griggs*.

In *Lockheed Martin Corp.*, this Court explained that the legislature eliminated the "mere continuation" theory as an exception to the rule of successor non-liability in enacting article 5.10(B)(2) of the Business Corporation Act. *See Lockheed Martin Corp.*, 16 S.W.3d at 135 n. 6; *see*

*also Shapolsky,* 56 S.W.3d at 138–39 (same; citing *Lockheed Martin Corp.*).[19] We join the *Shapolsky* court in declining to consider *Phippen,* on which the Agency relies, because article 5.10(B) effectively rejected the precedent on which *Phippen* relies, specifically, *Western Resources Life Ins. Co. v. Gerhardt,* 553 S.W.2d 783 (Tex. Civ.App.-Austin 1977, writ ref'd n.r.e.). *See Shapolsky,* 56 S.W.3d at 137–38. For the same reason, we reject the *Griggs* court's suggestion that the "mere continuation" theory remains a viable exception to the rule of successor non-liability. *See* 690 S.W.2d at 290 n. 1 (citing *Western Resources Life Ins. Co.*).

Accordingly, without expressing any opinion on whether the Agency established the elements of its claim that Allied Signal tortiously interfered with the Agency's sales agreements with the Tensor parties, we hold that Allied Signal established, as a matter of law, that its acquisition of the assets of the Tensor parties was authorized by article 5.10(B)(2) of the Business Corporation Act and was therefore justified.

We overrule the Agency's fourth point of error.

### Quantum Meruit

In its sixth point of error, the Agency contends that the trial court erred by rendering summary judgment on the Agency's quantum meruit claim and by refusing to submit that issue to the jury as to Allied Signal.[20] We address the Agency's point of error as a challenge to the trial court's failure to submit the Agency's quantum meruit claim to the jury and apply the usual standard of review. *See* Tex.R. Civ. P. 278; *Elbaor,* 845 S.W.2d at 243; *Exxon Corp.,* 842 S.W.2d at 631.

To be entitled to submit a claim of quantum meruit to the jury, a plaintiff must present more than a scintilla of evidence of the following elements:

(1) that the plaintiff rendered valuable services or furnished materials;

(2) that the services rendered or materials furnished were undertaken for the person or entity sought to be charged;

(3) and that the person or entity sought to be charged accepted and enjoyed the services or materials;

(4) under such circumstances as reasonably notified the person or entity sought to be charged that the plaintiff, in performing the services or providing the materials, expected to be paid by the person or entity sought to be charged.

*See Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex. 1990). Quantum meruit is based on a promise implied by law to pay for benefi-

---

**19.** In enacting article 5.10(B), the legislature rejected three exceptions to the majority rule of successor non-liability under the Third Restatement of the Law of Torts for Product Liability, as follows: the "de facto merger" doctrine, the "mere continuation" theory, and the "product line" theory. *See Lockheed Martin Corp.,* 16 S.W.3d at 134–35 (citing and distinguishing Restatement (Third) of the Law of Products Liability § 12 (1998)); *see also Shapolsky,* 56 S.W.3d at 139.

**20.** The Agency's pleadings asserted a claim of quantum meruit against both the Tensor parties and Allied Signal, and the trial court granted both parties' motions for summary judgment. Despite the summary judgment, the Agency continued to amend its pleadings on quantum meruit, without objection by either the Tensor parties or Allied Signal, and filed a request that a question on quantum meruit be submitted to the jury as to Allied Signal, which the trial court refused. Because the trial court and the parties effectively reconsidered the merits of the quantum meruit claim in refusing to submit the Agency's proposed question to the jury, we reject Allied Signal's contention that we should review only the summary judgment ruling and address the challenge based on the latter ruling.

cial services rendered and knowingly accepted. *Air Conditioning, Inc. v. L.E. Travis & Sons, Inc.,* 578 S.W.2d 554, 556 (Tex.Civ.App.-Austin 1979, no writ).

 The Agency did not sufficiently substantiate at least the second and third elements. The record does not show that the Agency rendered services "for" Allied Signal or that Allied Signal accepted those services. Even if the Agency's efforts may have benefitted Allied Signal, proof of benefit is not legally sufficient to show that the services were rendered *"for"* Allied Signal or that Allied Signal accepted the services. *See Bashara v. Baptist Mem. Hosp. Sys.,* 685 S.W.2d 307, 310 (Tex. 1985). (Emphasis in original.) Despite any possible benefit to Allied Signal, the Agency has not shown that any of the services that it claimed to have performed after the March 31, 1998 asset transfer were performed for Allied Signal or that Allied Signal accepted those services. Because the Agency did not sufficiently demonstrate triable issues of fact on the second and third elements, the Agency could not sufficiently substantiate that the circumstances reasonably notified Allied Signal that the Agency expected to be paid. Accordingly, the trial court did not err by refusing to submit the Agency's quantummeruit claim against Allied Signal to the jury.

We overrule the Agency's sixth point of error.

### Tensor Parties' Challenge to Measure of Damages Submitted to Jury

In their first issue, the Tensor parties contend that the trial court erred by submitting question 2 of the charge. Question 2 was conditioned on the jury's finding that any of the Tensor parties failed to comply with the sales agreements with the Agency and asked the jury to assess damages for "the following element of damages, if any, and none other ...[:] the amount of unpaid commissions, if any, for the time period from July 20, 1994 through orders received by the Tensor parties on or before March 31, 1998." The Tensor parties contend that this instruction was error because it authorized the jury to award damages based on sales for which the Tensor parties never received payment.

 A party must present its objections to the charge (1) to the trial court, either in writing or by dictating them to the court reporter, (2) in the presence of the court and opposing counsel, and (3) before the charge is read to the jury. TEX.R. CIV. P. 272. Objections not presented in this manner are waived. *See id.* To be sufficiently specific, the party's objection must identify the claimed error and explain the basis of the party's complaint. TEX.R. CIV. P. 274; *Castleberry v. Branscum,* 721 S.W.2d 270, 276 (Tex.1986). A sufficiently specific objection enables the trial court to understand the party's precise grounds and to rule. *Castleberry,* 721 S.W.2d at 276. We determine whether a party has preserved error in the jury charge by inquiring whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. *See State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992); *see also Miga v. Jensen,* 96 S.W.3d 207, 212–13 (Tex.2002) (upholding preservation based on *Payne* ); *Alaniz v. Jones & Neuse, Inc.,* 907 S.W.2d 450, 451–52 (Tex.1995) (noting that *Payne* did not revise preservation requirements of rules of civil procedure regarding jury charge, but did mandate that those requirements be applied in common sense manner that serves, rather than defeats, rules of procedure). As required by *Payne,* we review the record to determine whether the Tensor parties made the trial court aware of their complaint that ques-

tion 3 should never have been submitted to the jury and whether they obtained an adverse ruling. *See also* TEX.R.APP. P. 33.1(a) (general rules for preservation of error).

■ The Tensor parties contend that they preserved their challenge by objecting to the charge, but the record indicates otherwise. The Tensor parties did not raise any specific objections to the charge. Instead, they asserted a single, global adoption of all of Allied Signal's objections. Allied Signal, not the Tensor parties, objected to submitting question 2 to the jury. Allied Signal's objection, which the trial court overruled, is as follows:

> COUNSEL FOR ALLIED SIGNAL:.... Defendant Allied Signal objects to Question Number 2 on damages. Under the sales agreements that issue should—that instruction should inquire only as to invoices paid to Tensor, QDT and/or QSI by its customers, so the instruction is improper and we object on that basis.

This objection by Allied Signal followed two prior substantive objections and was followed, in turn, by three additional substantive objections. The trial court considered each of Allied Signal's six objections individually and overruled each one in turn. After the trial court overruled Allied Signal's objections, the following exchange occurred:

> COUNSEL FOR THE TENSOR PARTIES: The Defendant[s] Tensor, QDT[,] and QSI join[ ] those objections.
> THE COURT: Really? I don't know that you can do that. I'm not—

> COUNSEL FOR THE TENSOR PARTIES: I was doing that in connection with our—our earlier agreement.
> THE COURT: Okay. All right. Okay. Pursuant to the earlier agreement, overruled.

As this excerpt reflects, the Tensor parties' response to the trial court merely referred to a prior agreement without disclosing the substance of that agreement. Although the trial court overruled the Tensor parties' massed, adopted objection, the record suggests that the trial court's ruling was premised on the court's having been made to understand that an agreement concerning *charge* objections had occurred. The record before us, however, does not reflect any agreement of that type.

The record does include a signed order granting Allied Signal's motion that objections by Allied Signal would suffice to preserve error asserted by the Tensor parties, and vice versa, but that order encompassed only *evidentiary* objections.[21] In contending that this stipulation nevertheless sufficed, the Tensor parties rely on *Operation Rescue–National v. Planned Parenthood*, 937 S.W.2d 60 (Tex.App.-Houston [14th Dist.] 1996), *aff'd as modified on other grounds*, 975 S.W.2d 546 (Tex.1998), in which a stipulation, that one defendant's objections applied to all, was held adequate to encompass objections to the jury charge. *Id.* at 71. Although we may surmise that the stipulation in *Operation Rescue–National* was not limited to evidentiary objections and was thus less narrowly drawn than the stipulation by

---

21. The order states that, "the *evidentiary* objection of any defendant [would] preserve error for all defendants." (Emphasis added.) *See also Owens–Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 556 (Tex.App.-Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998) (allowing defendant to rely on codefendant's *evidentiary* objection in multiple-party case in which the trial court *required* agreement to that effect, defendants agreed, and plaintiffs did not object); *Celotex Corp. v. Tate*, 797 S.W.2d 197, 201–02 (Tex.App.-Corpus Christi 1990, writ dism'd by agr.) (upholding preservation of *evidentiary* challenges premised on agreements that parties could rely on objections of other parties).

Allied Signal and the Tensor parties here, the opinion of our sister court does not reveal the contents of the defendants' stipulation. *See id.* Because the agreement claimed here clearly falls far short of encompassing objections to the charge, we decline the Tensor parties' request to apply *Operation Rescue–National's* preservation-by-adoption rule to this case. We further conclude that the Tensor parties may not rely on the trial court's having authorized the Tensor parties and Allied Signal to agree that the *evidentiary* objections of either would preserve error as to the other party. Accordingly, we reject the Tensor parties' reliance on the sufficiency of that agreement as having preserved any error in the charge.

The question thus becomes whether, by merely "joining" all of Allied Signal's objections, the Tensor parties (1) made the trial court sufficiently aware of their complaint that question 2 should never have been submitted to the jury and (2) obtained an adverse ruling on that complaint. *See Payne,* 838 S.W.2d at 241. We conclude that they did not.

Rule 274, which governs objections to the jury charge, places responsibility on individual parties and thus contemplates action by individual parties. *See* Tex.R. Civ. P. 274 ("A *party* objecting to a charge ..."; "[w]hen the complaining *party's* objection....") (Emphasis added.) [22] As addressed above, rule 274 also requires distinct, specific objections that timely and plainly make the trial court aware of the complaint. *See id.; Payne,* 838 S.W.2d at 241. Consistent with imposing responsibility on each party and with requiring clear and specific objections by each party, rule 274 provides that, "No objection to one

part of the charge may be adopted and applied to any other part of the charge by reference only." *See* Tex.R. Civ. P. 274; *see C.T.W. v. B.C.G.,* 809 S.W.2d 788, 793 (Tex.App.-Beaumont 1991, no writ); *Washburn v. Krenek,* 684 S.W.2d 187, 190 (Tex. App–Houston [14th Dist.] 1984, writ ref'd n.r.e.).

Rule 274's prohibition against adopting by reference has generally been interpreted as prohibiting one party from incorporating by reference its own objections to another portion of the charge. *See C.T.W.,* 809 S.W.2d at 793; *Washburn,* 684 S.W.2d at 190. Yet, nothing in the rule limits its application to that context. *See* Tex.R. Civ. P. 274. In *Wright Way Construction Co. v. Harlingen Mall Co.,* the Corpus Christi Court of Appeals unhesitatingly relied on rule 274's prohibition against adopting prior objections and held that one of two appellants in a multi-party case had not preserved error. 799 S.W.2d 415, 420–21 (Tex.App.-Corpus Christi 1990, writ denied). Like the Tensor parties here, the party claiming error on appeal had merely adopted a codefendant's objections. *See id.*

A recognized commentator on the court's charge has noted the following observation concerning the rationale that underlies rule 274's prohibition against adopting prior objections:

> The trial judge should not be required to recall arguments made earlier in the charge conference in determining whether a party has met the burden of clearly and distinctly setting forth objections and grounds. The goal of [r]ule 274 is to give all participants, including the trial judge and the appellate courts,

---

22. This is true for all rules that govern the charge. *See also* Tex.R. Civ. P. 272 ("... the party making such objections ..."); 272 ("Either party may present...."; "... [a] request by either party...."); 276 ("the party ask-

ing...."); 278 ("... a party shall not be entitled...."; "... relied upon by the opposing party...."); 279 ("... at the request of either party....").

an opportunity to know with certainty that all objections have been made at the designated point in the proceedings. Adoption of objections by reference does not advance the purposes of [r]ule 274. Charles R. "Skip" Watson, Jr., *The Court's Charge to the Jury, in* STATE BAR OF TEX., PROF. DEV. PROGRAM, ADVANCED CIVIL TRIAL COURSE 7, 7–28 (2003).

▮▮▮▮▮▮ Well-settled law holds that a trial court properly overrules an objection that neither specifies the charge error complained of nor the grounds for the complaint. *See Castleberry,* 721 S.W.2d at 276–77. Objections that are not sufficiently specific do not preserve error. *Id.* The Tensor parties' attempt to challenge the trial court's submitting question 2 of the charge simply by asserting a global adoption of Allied Signal's six objections was neither specific nor stated the grounds for the complaint. Accordingly, the Tensor parties contravened rule 274 by not making the trial court aware, timely and plainly, of the Tensor parties' specific complaint concerning question 2. *See Payne,* 838 S.W.2d at 241; *see also Alaniz,* 907 S.W.2d at 451–452.

We conclude that the record does not reflect that the trial court endorsed an agreement that objections by either Allied Signal or the Tensor parties sufficed to preserve error beyond evidentiary complaints. Accordingly, that agreement did not encompass objections to the charge. We further conclude, as the trial court surmised, that the Tensor parties did not preserve any error premised on erroneously submitting question 2 to the jury merely by "joining" the six substantive objections lodged by Allied Signal. Instead, the Tensor parties were required to present their own objections. We further conclude that the Tensor parties neither met that requirement nor obtained an adverse ruling.

*See Wright Way Constr. Co.,* 799 S.W.2d at 421; TEX.R. CIV. P. 274; TEX.R.APP. P. 33.1(a). Accordingly, we hold that the Tensor parties did not timely present to the trial court the legal contention on which they premise their third issue, specifically, that question 2 should not have been submitted to the jury.

We overrule the Tensor parties' first issue.

## Tensor Parties' Challenge to Damages

The Tensor parties' second issue presents an alternative challenge concerning the damages awarded by the jury. In this issue, the Tensor parties contend that the damages are excessive and based on factually insufficient evidence and ask that we reform the trial court's judgment by "ordering" a remittitur for a lesser amount.[23]

▮▮▮▮ Questions of the excessiveness of actual damages and requests for remittitur present challenges to the factual sufficiency of the evidence. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex. 1998); *Carter v. Steverson & Co.,* 106 S.W.3d 161, 168 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); *Hawthorne v. Guenther,* 917 S.W.2d 924, 937 (Tex.App.-Beaumont 1996, writ denied). Because the remedy sought by a factual-sufficiency challenge is a new trial, factual-sufficiency complaints must be preserved by a motion seeking that relief. TEX.R. CIV. P. 324(b)(4); *McDade v. Tex. Commerce Bank,* 822 S.W.2d 713, 721 (Tex.App.-Houston [1st Dist.] 1991, writ denied). A request for relief by remittitur must, therefore, be preserved in the trial court by a motion that seeks remittitur, whether filed independently or as part of a motion for new trial. *See Hawthorne,* 917 S.W.2d at 937.

---

**23.** This Court's authority is limited to suggesting a remittitur. *See* TEX.R.APP. P. 46.4 (*"Sug-* *gestion* of Remittitur by Court of Appeals"). (Emphasis added.)

## A. Remittitur

 The Tensor parties filed a motion for new trial, in which they argued that the award of damages was excessive, but did not request a remittitur in that motion or by a separate motion seeking remittitur. Instead, they sought remittitur in their motion for judgment notwithstanding the verdict. Although they acknowledge that their issue presents a factual-sufficiency challenge, the Tensor parties contend that they preserved their request for reformation of the trial-court judgment through their motion for judgment notwithstanding the verdict.

Consistent with rule 301, which governs motions for judgment notwithstanding the verdict, the Tensor parties' rule 301 motion sought relief by rendition only—not a new trial. *See* Tex.R. Civ. P. 301. By including their request for a remittitur within their motion for judgment notwithstanding the verdict, the Tensor parties essentially requested that the trial court modify its judgment on the grounds that the damages awarded exceeded the evidence as a matter of law. *See Landmark Am. Ins. Co. v. Pulse Ambulance Serv., Inc.,* 813 S.W.2d 497, 499 (Tex.1991); Tex.R. Civ. P. 329b(g) (governing motions to modify, correct, or reform the judgment).

 Moreover, the amount requested for rendition in the trial court, $211,164.97, differs from the $547,446.91 amount that the Tensor parties propose that we suggest as remittitur here. A party preserves no error for an appellate complaint that enlarges the complaint presented to the trial court because the trial court has not had the opportunity to rule on the enlarged complaint. *See In re C.O.S.,* 988 S.W.2d 760, 765 (Tex.1999) (citing and quoting from *Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982)); Tex.R.App. P. 33.1(a)(1)(A).

Given these procedural circumstances, we conclude that the Tensor parties' motion for judgment notwithstanding the verdict did not preserve any "matter of law" points challenging the trial court's refusal to suggest remittitur, either in the amount proposed to the trial court or to this Court. Accordingly, we confine our analysis to considering whether factually sufficient evidence supports the $906,793.90 awarded as actual damages.

## B. Excessiveness Challenge

 The Tensor parties preserved their factual-sufficiency challenge to the excessiveness of the damages awarded in their motion for new trial. We review excessive-damages complaints as challenges to the factual sufficiency of the evidence to support the damage award and apply the same test for determining any factual-sufficiency challenge. *See Maritime Overseas Corp.,* 971 S.W.2d at 406. We consider and weigh all the evidence and may set aside the verdict only if it so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Id.* at 407. In considering and weighing the evidence, however, we must defer to the factfinder as final determiner of the credibility of witnesses and the weight to give their testimony. *Id.* If we conclude that the evidence is factually insufficient and that the award of damages is, therefore, excessive, we must detail why we reach that result. *Id.* In that instance, this Court may suggest a remittitur. *Id.*

 The Tensor parties focus their challenge on their contention that the jury "obviously" considered only Plaintiff's Exhibit 30 in awarding the Agency $906,793.90 for "the amount of unpaid commissions, if any, for the time period from July 20, 1994 through orders received by the Tensor parties on or before March 31,

1998," in response to question 2 of the charge. Exhibit 30 consists of a single-page chart, prepared by the Agency, that summarizes the 87 pages of supporting data, which also comprise Exhibit 30, and indicated the Agency's interpretation of that data as to the total amount of commissions due for certain periods. It is undisputed that the underlying data were Tensor records that pertained to the Agency's sales and were produced to the Agency through discovery.

We note that the record reflects that the Agency did not keep the most accurate records, or even good records. Asfahl worked without an assistant and refused to hire an assistant when the Tensor parties suggested that he do so. The Agency relied on the Tensor parties' bookkeeping, and had to rely on their producing that bookkeeping in response to discovery to a significant degree in calculating proposed damages. The record further reflects ongoing controversy among the parties concerning whether commissions were due to the Agency and a resulting protracted discovery process that continued up to and including trial.

The Tensor parties contend that the totals shown on the summary page of Exhibit 30 did not exclude either commissions not covered by the Agency's sales agreements, sales to customers not included in the agreements, or amounts already paid. The Tensor parties argue that other data compilations they produced to the Agency, specifically, Exhibits 29 and 33, encompassed those exclusions.[24] The Tensor

parties contend that the total damages due to the Agency after taking those exclusions into consideration is not $906,793.90, but $567,446.91.

■ The Tensor parties' argument ignores that the evidence comprised not only Exhibits 29, 30, and 33, but many other exhibits as well as the testimony of Asfahl and Tensor principals and employees. Asfahl's testimony included his assertions that he was personally familiar with all invoices and the sales register supporting the Agency's claimed damages. Tensor's testimony included admissions that the Tensor parties' calculations contained mistakes and other statements that the Agency had been paid all sums due in full as of the date of trial. It was the role of the jury to reconcile these conflicts as well as to assess the credibility of the witnesses in arriving at its verdict. *See Maritime Overseas Corp.*, 971 S.W.2d at 407. That the jury apparently agreed with the Agency's calculation does not mean that the jury did not consider and reconcile all the evidence in arriving at that agreement. *See id.*

Having reviewed the evidence, we cannot say that the jury's awarding the Agency $906,793.90 in actual damages was clearly wrong and manifestly unjust and therefore hold that factually sufficient evidence supports the award.

We overrule the Tensor parties' second issue.

---

**24.** Exhibit 29 is similar to Exhibit 30, but includes notations of "already paid," "not Tensor sale," "non-commissionable product," or "non-commissionable product-repair" under a column entitled "Reason for Non–Payment of Asfahl Commission." Exhibit 33 is a typewritten list, apparently prepared by the Agency and submitted to the Tensor parties, of companies listed in the Agency sales agreements, successors to those companies, and companies that did not fit either of those categories but were "procured" for the Tensor parties through the Agency's efforts. The list has several strikeouts marked on company names as well as other markings, some of which the Agency made and others of which Tensor principal Roberts made during his deposition. The record reflects that Allied Signal and the Tensor parties vigorously opposed admission of both exhibits into evidence.

## Tensor Parties' Challenge to Admissibility of the Agency's Exhibit 30

 The Tensor parties' fourth issue challenges the trial court's admitting the Agency's damages summary, Exhibit 30, over their and Allied Signal's objection.[25] In reviewing the trial court's decision to admit Exhibit 30, we determine whether the trial court abused its discretion by ruling without regard for any guiding rules and principles. *See Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). If the record discloses a legitimate basis for the evidentiary ruling, we must uphold the ruling. *See id.* In addition, we may not reverse an evidentiary ruling unless the error probably caused the rendition of an improper judgment. *See id.;* Tex.R.App. P. 44.1(a).

 As explained above, Exhibit 30 comprises a chart, prepared by Asfahl on behalf of the Agency, that summarized 87 underlying documents produced to the Agency through discovery. The summary identified amounts owed and by which of the Tensor entities, broken down further by the rate of commission due, as well as "Bates"-stamp references to the supporting documents. The summary also identified several, specific time periods that corresponded to the cutoff date for limitations, the date of the asset-purchase, and other dates. After the trial court directed a verdict that the Agency was not entitled to future commissions under the APA, the pertinent time periods became the following: pre-July 20, 1994 (the start date for limitations) and post-July 20, 1994 until March 31, 1998 (the date of the asset-

purchase agreement).[26] For the post-July 20, 1994 time period, the total amount listed as owed was $906,793.90. This was the amount that the jury awarded as actual damages.

The first trial objection to Exhibit 30 urged surprise and delay. In overruling this objection, the trial court noted, for the record, that the parties had been engaged in significant, ongoing controversy over the admissibility of a summary and that the trial court had resolved that controversy by deciding that a summary was appropriate. Asfahl then testified that he was "personally familiar with every entry" and had "reviewed all of the underlying documentation upon which [the] data had been derived," which was present in the courtroom. When the Agency's counsel offered Exhibit 30 into evidence, a new objection was made. This objection challenged Asfahl's qualifications to prepare the summary. When the Agency's counsel replied, "This is a calculation of his damages based on looking at the invoices and looking at the checks and seeing that he hadn't been paid," the trial court interjected, "but it's just math." The objection was pursued, however, on the grounds that, "There has to be a decision as to whether or not he was entitled to be paid."[27] But the trial court again interjected, "Give me something more specific ... I mean, if it's just his compilation of the invoices and adding them up," which produced the following response: "I think that's what it is." After that exchange, the trial court admitted Exhibit 30.

---

**25.** In contrast to their complaints premised on the jury charge, the Tensor parties preserved error to assert this issue based on the trial court's having endorsed their agreement with Allied Signal that evidentiary objections by Allied Signal would preserve error as to the Tensor parties and vice versa.

**26.** The summary identified two additional post-APA time periods.

**27.** As noted in the preceding analysis of the Tensor parties' second issue and as the Agency points out in its brief, Exhibit 29 contained data indicating the reasons why the Tensor parties did not pay certain invoices.

Rule 1006 of the Rules of Evidence imposes three requirements for the admissibility of summaries of records that "cannot conveniently be examined in court," as follows: the underlying records are (1) voluminous; (2) have been made available to the opponent for inspection; and (3) the underlying records are admissible. TEX.R. EVID. 1006. At 87 pages, the underlying data is voluminous. The second and third requirements are readily met because it is undisputed that the underlying data are Tensor records that were in the courtroom during trial, produced to the Agency by the Tensor parties through the discovery process and therefore admissible, at least as non-hearsay admissions of a party-opponent. *See* TEX.R. EVID. 801(e)(2). Concerning Asfahl's qualifications to prepare the exhibit, the record contains his testimony that he was personally familiar with all the documents that provided the underlying data for Exhibit 30. *See* TEX.R. EVID. 602. There was no objection to this testimony or to Asfahl's testimony that the summary reflected commissions the Agency was owed.

 As in their second issue, the contention that lies at the core of the Tensor parties' challenge to Exhibit 30 on appeal is their insistence that the jury necessarily relied on the exhibit in awarding the Agency $906,793.90. As addressed above, the record does not compel that conclusion. Moreover, the record provides independent support, beyond Exhibit 30, for the Agency's claim of $906,793.90, through Asfahl's own testimony, to which neither the Tensor parties nor Allied Signal objected. In addition, the Tensor parties contended, at a bench conference concerning the admissibility of a different exhibit, that the exhibit under discussion was "totally cumulative" of Exhibit 30. No error arises from admitting evidence that is cumulative of other, properly admitted evidence. *See Owens–Corning Fiberglas Corp.*, 916 S.W.2d at 561.

The circumstances of this case differ, therefore, from *City of Dallas v. GTE Southwest, Inc.*, 980 S.W.2d 928, 935 (Tex. App.-Fort Worth 1998, pet. denied), in which the court rejected the attempt by a proponent of a summary to circumvent a trial-court deadline for designation of expert witnesses. The underlying documents were not in evidence and therefore not before the court, as here, and the witness presented to offer the summary could not, as here, vouch for the underlying data. *Id.* Also distinguishable is *Baylor Medical Plaza Services v. Kidd*, 834 S.W.2d 69 (Tex.App.-Texarkana 1992, writ denied). In that case, the proponent of a summary could testify only that the bills underlying the summary were represented to that witness as bills incurred by the plaintiff, but there was no testimony to establish that fact. *Id.* at 77. Here, the Agency used Tensor documents and established Asfahl's personal knowledge of those documents, as obtained from the Tensor parties.

We hold that the trial court did not abuse its discretion by admitting Plaintiff's Exhibit 30 and overrule the Tensor parties' fourth issue.

### Tensor Parties' Challenge to Attorney's Fees Awarded

The Tensor parties' fifth and sixth issues challenge the attorney's fees awarded in the judgment.

### A. Failure to Segregate

In their fifth issue, the Tensor parties contend that the award of attorney's fees must be reversed for failure to segregate. The Tensor parties' challenge is premised, however, on their contention that the trial court erred by submitting question 4 of the jury charge. They argue that this Court must remand this cause because question 4 asked only, "What is a reasonable fee for

the necessary services of Charles Asfahl's attorneys in this case?" and did not require the jury to segregate between fees allocable to contract claims from those related to other claims for which attorney's fees are not recoverable.

 Attorney's fees are recoverable only for authorized claims. *Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 389 (Tex. 1997). The Tensor parties acknowledge the Agency's entitlement to attorney's fees on its breach of contract claim, *see* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (Vernon 1997), and correctly contend that attorney's fees are not recoverable for the tort claims that the Agency asserted and on which it did not prevail. *See, e.g., City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 367 (Tex.2000); *AU Pharm., Inc. v. Boston,* 986 S.W.2d 331, 337 (Tex. App.-Texarkana 1999, no pet.) (noting that attorney's fees are not recoverable for tort claims). When a party's claims include causes of action for which attorney's fees are recoverable and other claims for which attorney's fees are not recoverable, the party must offer proof that segregates between recoverable and nonrecoverable claims. *Green Int'l, Inc.,* 951 S.W.2d at 389; *Hruska v. First State Bank,* 747 S.W.2d 783, 785 (Tex.1988); *Paramount Nat'l Life Ins. Co. v. Williams,* 772 S.W.2d 255, 266 (Tex.App.-Houston [14th Dist.] 1989, writ denied). An exception applies when claims arise out of the same transaction and are "so interrelated that prosecuting them entails proof or denial of essentially the same facts." *Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 73 (Tex.1997); *see Paramount Nat'l Life Ins. Co.,* 772 S.W.2d at 266.

 When segregation is proper, as the Tensor parties contend here in response to the Agency's contention that the exception applies, the jury not only determines the amount of attorney's fees, but also determines the segregation issue. *See Green Int'l, Inc.,* 951 S.W.2d at 389; *Hruska,* 747 S.W.2d at 785; *Paramount Nat'l Life Ins. Co.,* 772 S.W.2d at 266. Accordingly, the party seeking segregation waives error when that party does not object to the attorney's fees question in the jury charge on the ground that it does not provide for segregation of any fees the jury might award among recoverable and non recoverable claims.[28] *Hruska,* 747 S.W.2d at 784–85; *Paramount Nat'l Life Ins. Co.,* 772 S.W.2d at 266.

 The record reflects that only Allied Signal, and not the Tensor parties, objected to the attorney's fees question on the grounds of failure to segregate. In contending that they preserved their complaint, the Tensor parties again rely on their attempted adoption of Allied Signal's objections to the charge. For the same reasons stated in overruling the Tensor parties' first issue, we reject their claim that they preserved error here. Because the record thus reflects no objection by the Tensor parties, they have waived any error in the trial court's submitting the attorney's fees question to the jury without also requiring the jury to segregate.

We overrule the Tensor parties' fifth issue.

## B. Excessiveness

 In their sixth issue, the Tensor parties contend that the jury's award of over $1.3 million in attorney's fees is excessive and request that we suggest a remittitur for a specific, lesser amount. An attorney's fee award may be challenged for

---

28. We reject, therefore, the Tensor parties' contention that they preserved error through their motion for new trial.

the sufficiency of the evidence to support the award. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991). We address the Tensor parties' issue as raising a factual-sufficiency challenge and apply the well-settled standard of review that governs those challenges.[29] *E.g., Maritime Overseas Corp.,* 971 S.W.2d at 406.

A "short hand" version of other factors that may properly be considered in awarding attorney's fees is that the fees must be "reasonable and necessary." *See Sterling,* 822 S.W.2d at 10. The reasonableness of attorney's fees is a question of fact. *See Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex.1990). We note further that, in reviewing an attorney's fee award for excessiveness, we may draw upon our common knowledge as justices of the court and our experience as lawyers and judges. *See Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.,* 48 S.W.3d 225, 241 (Tex.App.-San Antonio 2001, pet. denied). Factors that we consider in determining whether attorney's fees are reasonable include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997) (quoting TEX. DISCIPLINARY R. PROF. CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE tit. 2, subtit. G app. (STATE BAR RULES, art. X, § 9)). We must be mindful, however, that we are reviewing a jury's verdict and may not substitute our judgment for that of the factfinder. *E.g., Maritime Overseas Corp.,* 971 S.W.2d at 406.

The Agency's trial counsel and an independently retained attorney offered expert-witness testimony in support of the attorney's fees that the Agency requested. Both attorneys attested to the magnitude and complexity of the case and described a protracted discovery process that produced 93,000 documents and continued until the trial date. In addition, both attorneys noted that the case was vigorously contested and defended by both Allied Signal and the Tensor parties. The Agency's retained expert indicated that he had reviewed the Agency's billing records and found them reasonable, given the complexity of the case. The billing records were admitted into evidence without objection. In the opinion of the expert, the Agency's

---

**29.** As in their challenge to actual damages, the Tensor parties' arguments include the contention that this Court should reform the attorney's fee award as a matter of law. The Tensor parties did not preserve error to assert this contention, however, because they challenged the fee award as excessive only in their motion for new trial. We note further that, in contending that the fee award is excessive, the Tensor parties' arguments in support of this issue repeat their "failure to segregate" contentions. Because we overruled those contentions in their fifth issue, we decline to reconsider those arguments as bearing on their claim that the award is excessive.

retained counsel's $185.00 per hour billing rate was below the market rate, and the fair market value of the Agency's counsel's services was $250.00 per hour, given the firm's expertise and experience. After applying that rate to the 3,623.85 hours billed, the expert arrived at the $1,328,922.00 figure that the jury awarded. The Agency's trial counsel agreed that the amount suggested was reasonable.

The Tensor parties' chief complaint in challenging the award as excessive is that it does not bear a reasonable relationship to the damages awarded. *See Musgrave v. Brookhaven Lake Prop. Owners Ass'n*, 990 S.W.2d 386, 403 (Tex.App.-Texarkana 1999, pet. denied). But the amount of damages awarded is not the sole determining factor, especially when we consider the complexity of this case. *See Rio Grande Valley Gas Co. v. City of Edinburg*, 59 S.W.3d 199, 224 (Tex.App.-Corpus Christi 2000, no pet.) (affirming award of attorney's fees awarded for trial that exceeded three times the amount of actual damages on grounds of complexity of issues raised). We also reject the Tensor parties' contention that the award exceeds the amount that Asfahl agreed to pay his attorneys. Although Asfahl had initially agreed to pay his attorneys $185 to $195 per hour, an amount that the Agency's expert disputed as adequately reasonable, given the attorney's experience and expertise, that agreement was changed to an alternative, contingency agreement for a reduced hourly rate combined with an agreed percentage for any recovery.

Having reviewed the Tensor parties' challenge and the evidence that the Agency offered to support the jury award, we cannot say that the evidence that supports the award of attorney's fees is so weak that the award is clearly wrong and manifestly unjust. *See Maritime Overseas Corp.*, 971 S.W.2d at 406-07. In addition, after having reviewed the record based on

the *Arthur Andersen & Co. v. Perry* factors and having also drawn upon our common knowledge and experience as lawyers and judges, we likewise cannot say that the evidence the Agency offered fails to show that the jury's award was reasonable and necessary. *See Arthur Andersen Co.*, 945 S.W.2d at 818; *Sterling*, 822 S.W.2d at 10; *Aquila Southwest Pipeline*, 48 S.W.3d at 241. Accordingly, we hold that the jury's award was not excessive.

We overrule the Agency's sixth point of error.

### Conclusion

We reverse that portion of the judgment of the trial court that awards the Agency the sum of $518,686.10, to be recovered from the Tensor parties, jointly and severally, as a result of trebling pursuant to section 35.84 of TSRA and render judgment that the Agency take nothing on its claims pursuant to section 35.84 of TSRA. We affirm the judgment of the trial court in all other respects.