

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-16-00282-CV

---

MUSA ("MOSES") N. MUSALLAM          APPELLANT

V.

AMAR B. ALI          APPELLEE

----------

### FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 067-266677-13

----------

## MEMORANDUM OPINION[1]

----------

A jury found that Appellant Musa N. Musallam breached a contract he had

with Appellee Amar B. Ali for the sale of a wholesale distribution company and

awarded Ali $904,924 in damages for past and future lost profits. Musallam

appeals, arguing that the contract is unenforceable as a matter of law and that

---

[1]*See* Tex. R. App. P. 47.4.

the jury's lost-profits award is not supported by legally sufficient evidence. We affirm.

## I. BACKGROUND

Musallam was the sole shareholder of Fanci Candy Company, a wholesale distribution company in the business of distributing consumer goods such as candy, soft drinks, and (particularly relevant to this case) tobacco products to convenience stores in north Texas. As part of its tobacco-distribution business, Fanci Candy held direct-distribution agreements with two of the major tobacco companies in the United States, Altria Group Distribution Company and Lorillard Tobacco Company, Inc., which enabled it to purchase tobacco products directly from certain of Altria's and Lorillard's tobacco manufacturers and then sell those products to convenience stores, which made them available for retail purchase. Direct-distribution agreements with these manufacturers were not easy to come by because Altria and Lorillard rarely, if ever, entered into such agreements with distributors who did not already have them. Thus, if an entity that lacked existing direct-distribution agreements with Altria's and Lorrillard's manufacturers desired to purchase tobacco products directly from them, the main way for it to do so was to purchase a company that had a direct-distribution agreement and be grandfathered into the agreement.

Toward the end of 2012, Musallam decided to sell Fanci Candy and found an interested buyer in Ali. Ali's father owned A to Z Wholesalers, Inc., a company that, like Fanci Candy, was in the business of distributing candy, soft

2

drinks, and tobacco products to convenience stores. Ali had no ownership interest in A to Z Wholesalers, but he served as its vice president and was essentially responsible for running it. Unlike Fanci Candy, A to Z Wholesalers did not have direct-distribution agreements allowing it to purchase tobacco products directly from two of Altria's three major tobacco manufacturers, Phillip Morris USA and U.S. Smokeless Tobacco, or from certain of Lorillard's tobacco manufacturers. Because A to Z Wholesalers could not purchase tobacco products directly from those manufacturers, it had to purchase them from a middleman distributor. And unsurprisingly, it cost more for A to Z Wholesalers to purchase those tobacco products from its middleman than it cost Fanci Candy to purchase them directly from their manufacturers. Thus, Ali was interested in purchasing Fanci Candy because it presented an avenue by which he could acquire its direct-distribution agreements with Altria and Lorillard, thereby enabling him to purchase certain tobacco products at the price the manufacturers charged Fanci Candy. He could then turn a profit by selling those tobacco products to A to Z Wholesalers at the same marked-up price its middleman charged for them. In other words, acquiring Fanci Candy would enable Ali to step into the shoes of A to Z Wholesalers' middleman.

Ali's interest in purchasing Fanci Candy hinged on Altria and Lorillard continuing their direct-distribution agreements with Fanci Candy after Ali acquired it. After some negotiations, Musallam and Ali reached an agreement in principle whereby Ali would acquire Fanci Candy, subject to Altria's and Lorillard's

3

approval. However, Musallam believed that Altria and Lorillard were more likely to approve the sale of Fanci Candy if they saw A to Z Wholesalers as the buyer instead of Ali. Thus, as Musallam and Ali initially structured the deal, Ali's father and/or A to Z Wholesalers would be the buyer. Once Altria and Lorillard approved the sale, Ali could then replace Ali's father and/or A to Z Wholesalers as Fanci Candy's owner. To that end, Musallam and Ali executed a letter of intent on January 21, 2013, reflecting that Ali's father and/or A to Z Wholesalers would purchase Fanci Candy's stock and assets, subject to Altria's and Lorillard's approval of the change in ownership. The letter of intent also stated that Ali's father and/or A to Z Wholesalers "retain[ed] the right to assign this offer to any other individual or company" at their sole discretion.

Consistent with the letter of intent, on February 25, 2013, Musallam mailed to Altria and Lorillard documentation explaining the details of the proposed purchase of Fanci Candy and requesting their approval of it. By letter dated April 11, 2013, Altria notified Ali that it did not approve his request for A to Z Wholesalers to become a direct distributor of Phillip Morris USA and U.S. Smokeless Tobacco products. Musallam and Ali reworked the documentation that had been submitted to Altria by clarifying that Ali and not A to Z Wholesalers would be the purchaser, and on May 1, 2013, they submitted to Altria the updated documentation and again requested its approval of the sale. This resubmission was successful, and by letter dated June 7, 2013, Altria notified Ali that it approved the second submitted plan to purchase the stock ownership of

4

Fanci Candy and continue as a direct distributor of Phillip Morris USA and U.S. Smokeless Tobacco products. Unlike Altria, however, Lorillard had not sent a formal letter approving Ali's purchase of Fanci Candy.

Despite having secured Altria's approval but not Lorillard's, Musallam and Ali proceeded to formalize the terms of their letter of intent into a written stock transfer and asset purchase and sale agreement. The agreement reflects that Ali would purchase all of Fanci Candy's stock and assets from Musallam and provided, in relevant part, as follows:

> 1.03 **Consideration.** As consideration for the Subject Stock, Buyer, at the Closing, will pay to Seller the purchase price (the "Purchase Price") in an amount as follows:
>
> Total purchase price: $500,000.00*, plus Purchased Assets.
>
> *unless reduced as provided in Section 5.01(c).
> . . . .
>
> 1.04 **Closing.** The closing of the purchase and sale of the Subject Stock (the "Closing") shall take place at a Title Company, as selected by Buyer in his sole discretion, on or before July 1, 2013, (the "Closing Date").
>
> . . . .
>
> 5.01 **Conditions Precedent to Seller's Obligation to Sell the Stock.** The obligation of Seller to sell the Subject Stock is subject to the fulfillment prior to or at the Closing of the following conditions:
>
> . . . .
>
> (c) Seller shall obtain formal written approval from the following suppliers on suppliers' official corporate letterhead confirming that any direct contracts that exist between said suppliers and the Company shall remain in full force and effect after the transfer of the Subject Shares, and shall remain in full

5

force and effect for the remainder of the existing contract: 1) Altria Group Distribution Company to include: Phillip Morris, USA and U.S. Smokeless Tobacco Brands, Inc., and 2) Lorillard Tobacco Company, Inc. The parties agree that written approval of both Altria Group Distribution Company and Lorillard Tobacco Company and the continuing existence of the direct contracts with these companies is material in inducing Buyer to enter into this Agreement with Seller. Accordingly, should Buyer fail to obtain written approval from either company (or written approval secured by Seller), the Purchase Price shall be reduced to Two Hundred and Fifty Thousand Dollars and 00/100 ($250,000.00).

The "Purchased Assets" described in paragraph 1.03 included Fanci Candy's accounts receivable; real property; furniture, fixtures, and equipment (FF&E); inventory; and vehicles. Rather than setting a fixed value for these assets, the agreement instead provided a means of calculating their value on or before the closing date. Pertinent to this appeal, the agreement provided,

2.05 **Purchase price of "Vehicles".** The Buyer and Seller agree that the value of the Vehicles . . . shall be the Kelly Blue Book Value of the Vehicles on the Closing Date.

2.06 **Purchase price of "FF&E".** The Buyer and Seller agree that the value of the FF&E . . . shall be as mutually agreed upon by the parties prior to the Closing Date.

Musallam and Ali signed the agreement on June 18, 2013.

On June 28, 2013—three days before the July 1, 2013 closing date—Musallam and Ali learned that Lorillard had declined their request that Ali be approved as a direct purchaser of its tobacco products in connection with his

6

purchase of Fanci Candy.[2]  Having learned that Lorillard had not approved the

sale, Musallam emailed Ali the following:

> I have reviewed your proposed closing statement and the numbers are completely unacceptable.
>
> I am willing to negotiate the FFE but you are far too low.  Also, we still do not have the building appraisal.  Why has it taken so long to get this information?
>
> Additionally[,] you know we both assumed we had the Lorillard approval.  The deal does not work for me with a 250k reduction.  We are trying to resolve the issue[,] but it will not happen by Monday.
>
> I see no choice but to postpone the closing until we can resolve these issues.
>
> Please let me know if you agree or what other arrangements you propose.
>
> I want to make this work[,] but I cannot give the company away. Please be reasonable as we try to get this done[.]

Ali, however, wished to proceed to closing.  His lawyers responded to Musallam's

email by sending a letter to him reiterating the agreement's July 1, 2013 closing

date and its provision that if both Altria and Lorillard did not provide written

approval of the sale, then the purchase price of Fanci Candy's stock was to be

reduced to $250,000.  The letter further stated that if Musallam failed to close on

July 1, 2013, then Ali would seek to enforce the agreement through legal action.

---

[2]Although Musallam and Ali resubmitted documentation to Lorillard attempting to clarify the proposed sale and purchase as they had previously done with Altria, and although Lorillard, like Altria, ultimately approved the transaction, it did not do so until October 2013.

Musallam did not show for closing on July 1, 2013. Instead, on July 2, 2013, he sued Ali seeking a declaration that the June 18, 2013 agreement was unenforceable. Ali counterclaimed for breach of contract. The case was tried to a jury, which returned a verdict finding that Musallam breached the June 18, 2013 agreement and awarding Ali $904,924 in damages. Following the verdict, Musallam and Ali submitted the issue of attorney's fees to the court, which awarded Ali $230,262.26 in reasonable and necessary attorney's fees. The trial court entered judgment accordingly. Musallam appeals in two issues.[3]

## II. TRIAL COURT'S ENTRY OF JUDGMENT ON ALI'S BREACH-OF-CONTRACT CLAIM

In his first issue, Musallam contends the trial court erred by entering judgment on Ali's breach-of-contract claim because the June 18, 2013 stock transfer and asset purchase and sale agreement is not an enforceable contract, as he and Ali did not agree upon a material term—price of the sale. He points to paragraph 1.03 of the agreement, arguing it reflects that the total price Ali would pay to purchase Fanci Candy was $500,000 for Fanci Candy's stock, plus an

---

[3]Under the heading "Error Presented for Review," Musallam lists a third issue presented for review: whether the trial court erred by refusing to submit a question in the jury charge. However, Musallam presented no argument or authority on this issue in the body of his brief. Thus, we overrule Musallam's third issue as inadequately briefed. *See* Tex. R. App. P. 38.1(i); *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010) (recognizing that "[t]he Texas Rules of Appellate Procedure require adequate briefing"); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (observing that appellate court has discretion to deem issues waived due to inadequate briefing).

8

additional amount for the value of Fanci Candy's assets, which included its FF&E and vehicles. He then points to paragraphs 2.05 and 2.06 of the agreement, arguing that the former provides the purchase price of Fanci Candy's vehicles would be their Kelly Blue Book value on the closing date and that the latter provides the price of Fanci Candy's FF&E would be its value "as mutually agreed upon by the parties prior to" the closing date. According to Musallam, the evidence at trial demonstrated that he and Ali never agreed upon the value of Fanci Candy's vehicles or FF&E. For that reason, Musallam concludes, he and Ali never agreed upon a final total purchase price for the sale, and consequently, the June 18, 2013 agreement is not an enforceable contract. Rather, Musallam contends, the agreement merely reflects an unenforceable agreement to agree. Thus, Musallam argues, the trial court erred by entering judgment on Ali's breach-of-contract claim.

There is a preliminary obstacle to Musallam's argument that the June 18, 2013 agreement is unenforceable: the issue of whether, by virtue of the June 18, 2013 agreement, Musallam and Ali had agreed to the sale and transfer of Fanci Candy was submitted to the jury. The jury charge included the following question:

**QUESTION NO. 1**

Did Moses Musallam and Amar Ali agree to the sale and transfer of Fanci Candy Company in the [June 18, 2013] Stock Transfer and Asset Purchase and Sale Agreement?

9

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

If Moses Musallam and Amar Ali agreed to other essential terms but failed to specify price, it is presumed a reasonable price was intended.

The jury answered, "Yes." Musallam argues that this finding should be disregarded as immaterial because whether a particular agreement is an enforceable contract is a question of law.[4] Ali argues Musallam waived this attack on the jury's finding because he did not object to submitting Question No. 1 in the jury charge. We begin by considering waiver.

A trial court may disregard a jury finding if it is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A jury finding is immaterial if the question should not have been submitted, or if it was properly submitted but has been rendered immaterial by other findings. *Id.*; *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 752 (Tex. App.—Fort Worth 2008, pet. dism'd) (citing *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999)). A question that calls for a finding beyond the province of the jury, such as a question of law, may be deemed immaterial. *Spencer Eagle*,

---

[4]Musallam raised this argument in a post-verdict motion for judgment notwithstanding the verdict and motion to disregard, both of which the trial court denied. In his brief, Musallam renews this contention, arguing that "the fact that the jury in this case found that the parties intended to enter into an agreement is immaterial." We construe this contention as a complaint that the trial court erred by denying Musallam's motion to disregard the jury's finding on Question No. 1.

10

876 S.W.2d at 157; *City of The Colony*, 272 S.W.3d at 752. Here, Musallam contends the jury's finding on Question No. 1 was immaterial because it asked the jury to make a finding on a question of law—whether the June 18, 2013 agreement was an enforceable contract.

Musallam was required to preserve this complaint below. *See C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 784–86 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (applying preservation rules to complaint that trial court erred by submitting question of law to the jury); *see also Lakota Energy Ltd. P'ship v. Merit Mgmt. Partners I, L.P.*, No. 02-13-00057-CV, 2016 WL 6803181, at *4–5 (Tex. App.—Fort Worth Nov. 17, 2016, pet. filed) (mem. op.) (same). To preserve his charge complaint, Musallam had to timely and plainly make the trial court aware of the complaint and obtain a ruling. *See* Tex. R. Civ. P. 272–274; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g).

The record shows that Musallam did not object to the submission of Question No. 1 to the jury. Indeed, the record shows that during the charge conference, Musallam insisted that the submission of Question No. 1 was necessary. Although Musallam did not object to submitting Question No. 1, Ali did, arguing that question should not have been submitted to the jury because as a matter of law, the June 18, 2013 agreement was a valid, binding contract. In response, Musallam's counsel argued that it was necessary to submit Question

11

No. 1 to the jury because the evidence raised an issue of fact as to the question of contract formation—namely, whether his and Ali's reaching an agreement as to the price of Fanci Candy's assets prior to closing was a material term of the agreement. Thus, the record is unmistakable that Musallam acquiesced to submitting the issue of contract formation to the jury. It was not until his post-verdict motions—that is, it was not until after that issue was submitted to the jury and the jury found against him—that Musallam first objected that Question No. 1 asked the jury to decide a question of law. This was too late to preserve error. *See C.M. Asfahl Agency*, 135 S.W.3d at 786 (holding that post-verdict motion to disregard jury finding on question of law submitted in the jury charge was insufficient to preserve error where complaining party failed to object to submission of the question at issue); *see also Lakota Energy*, 2016 WL 6803181, at *4–5 (holding similarly). To preserve error in the submission of Question No. 1, Musallam was required to timely and plainly make the trial court aware of his complaint and obtain a ruling, and by failing to do so, he waived any error in its submission. *See* Tex. R. Civ. P. 272–274; *Ledesma*, 242 S.W.3d at 43–44; *Payne*, 838 S.W.2d at 241. It follows that he waived any complaint predicated upon the allegedly erroneous submission of Question No. 1, including the complaint that the trial court erred by denying his motion to disregard the jury's finding on Question No. 1, as well as the complaint that the trial court erred by entering judgment consistent with the jury's affirmative finding on Question No. 1. *See C.M. Asfahl Agency*, 135 S.W.3d at 768 (holding appellant waived complaint

12

that trial court erred by denying its motion to disregard as immaterial jury finding on legal question and entering judgment consistent with the jury's finding where appellant did not timely assert any challenge to the court's charge); *see also Lakota Energy*, 2016 WL 6803181, at \*4–5 (holding, in part, appellant waived complaint that submission of legal question to the jury was erroneous where appellant did not timely object to the court's charge).

We overrule Musallam's first issue.

### III. SUFFICIENCY OF LOST-PROFITS DAMAGES EVIDENCE

In his second issue, Musallam argues that the evidence is legally insufficient to support the jury's award of lost-profits damages to Ali.[5]

#### A. STANDARD OF REVIEW

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g);

---

[5]Musallam does not clearly state whether he contests the legal sufficiency or the factual sufficiency of the evidence to support the jury's award of lost-profits damages. Because the only relief he requests is that we render judgment in his favor, we construe his second issue as a legal-sufficiency challenge. *See, e.g.*, *Maynard v. Booth*, 421 S.W.3d 182, 183 (Tex. App.—San Antonio 2013, pet. denied) (construing appellant's sufficiency issue as only a legal-sufficiency challenge because appellant requested court render judgment in her favor and did not request, in the alternative, a remand for a new trial).

*Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

## B. EVIDENTIARY STANDARD FOR LOST-PROFITS DAMAGES

"[W]here it is shown that a loss of profits is the natural and probable consequence of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor." *Sw. Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098 (Tex. 1938). Such a loss need not be shown by exact calculation; however, the injured party must go further than showing that it suffered lost profits and must show the amount by competent evidence with reasonable certainty. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001). This is a fact-intensive determination that should be based on objective facts, figures, or data from which the lost-profits amount may be ascertained. *Id.* It is not required that the injured party produce in court the documents underlying the opinions or estimates. *Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 712 (Tex. App.—Fort Worth 2015, no pet.).

14

## C. Lost-Profits Evidence

Ali testified that because A to Z Wholesalers did not have a direct-distribution agreement allowing it to purchase tobacco products directly from certain of Altria's and Lorillard's manufacturers, it had to acquire those products from a middleman. He further stated that it cost less to purchase tobacco products directly from the tobacco manufacturers than it did to purchase them from a middleman. Thus, Ali told the jury, had Musallam followed through with closing on the sale of Fanci Candy, he would have been able to purchase certain tobacco products directly from Altria's manufacturers (such as Phillip Morris USA). He could then turn around and sell them to A to Z Wholesalers at the same marked-up price its middleman charged, thereby earning a profit amounting to the sum of the marked-up price at which he sold them, less the price he paid the manufacturers to acquire them.

Ali introduced into evidence a spreadsheet providing details of A to Z Wholesalers' sale of tobacco products from Altria's and Lorillard's manufacturers from July 1, 2013 (the closing date specified in the June 18, 2013 agreement), through January 30, 2016—a 31 month period. Among other things, the spreadsheet had columns showing (1) the total number of cartons of tobacco products A to Z Wholesalers purchased per tobacco manufacturer; (2) the cost A to Z Wholesalers' paid per carton for each manufacturer's products as of the date of the July 1, 2013 closing date; (3) the cost at which Fanci Candy was able to acquire those same cartons as of the same date; (4) the net difference between

15

the cost per carton at which A to Z Wholesalers had acquired the tobacco products and the cost per carton at which Fanci Candy had acquired the same products; and (5) the total savings that Ali would have realized on each manufacturer's tobacco products had he been able to purchase them at the price Fanci Candy did rather than the price A to Z Wholesalers did. Ali testified that he had obtained the data regarding the number of cartons of tobacco products that A to Z Wholesalers sold in that 31-month period and the cost per carton from its records and that he had obtained the data regarding Fanci Candy's cost per carton from Musallam.

Ali explained his lost-profits analysis further by walking the jury through an example. During the 31-month period, A to Z Wholesalers sold 414,832 cartons of Marlboro cigarettes, a tobacco product manufactured by Phillip Morris USA, an Altria company. The amount it cost A to Z Wholesalers to acquire those cigarettes from its middleman as of the date of closing was $52.16 per carton. Because of its direct-distribution agreement, Fanci Candy could acquire those same cigarettes at $50.92 per carton. Thus, Ali testified, if Musallam had closed on July 1, 2013, Ali could have acquired the Marlboro cigarettes at the $50.92 price Fanci Candy paid and then sold them to A to Z Wholesalers at the same $52.16 price it had paid its middleman for them, resulting in a $1.24 profit per carton. Multiplying that $1.24 per-carton profit times the 414,832 cartons of Marlboro cigarettes A to Z Wholesalers sold during the 31-month period, Ali

16

testified that he would have made a $514,391.68 profit on Marlboro cigarettes during the 31-month period had Musallam closed on July 1, 2013.

Ali performed this analysis on all the tobacco products A to Z Wholesalers purchased from its middleman during the 31-month period and which Fanci Candy could acquire for less. He concluded that had Musallam closed on July 1, 2013, he would have made $711,576.12 on tobacco products during that period.[6] And he testified that number was net profit except for taxes, which he testified would have been 33%, based upon his tax rate. By dividing the $711,576.12 total profit by the 31-month period in which it would have been made, Ali testified that had Musallam closed on July 1, 2013, his average monthly profit during the 31-month period was approximately $22,500. And he testified that based upon A to Z Wholesaler's past performance in tobacco sales, he expected that he would have made that $22,500 profit every month for the foreseeable future.

The jury ultimately awarded Ali $461,567.12 for lost profits in the past and $443,356.88 for lost profits in the future.

### D. SUFFICIENCY OF THE LOST-PROFITS EVIDENCE

Musallam attacks the jury's lost-profits award on several fronts. First, he contends that Ali's calculation that he sustained $711,576.12 in lost profits from July 1, 2013, through January 30, 2016, was fatally speculative because he

---

[6]Ali testified that because Lorillard had not approved his purchase of Fanci Candy as of July 1, 2013, he excluded any savings on Lorillard tobacco products he would have realized had he been able to purchase Lorillard's tobacco products directly.

17

reached that calculation by multiplying the total number of tobacco cartons A to Z Wholesalers sold over that 31-month period times the price it paid its middleman for those cartons as of July 1, 2013, rather than the average price of the cartons over that 31-month period. However, lost-profits damages can be based upon evidence of profit history. *Diep Tuyet Vo v. Vu*, No. 02-15-00188-CV, 2016 WL 2841286, at *5 (Tex. App.—Fort Worth 2016, no pet.) (mem. op.). Ali testified that the data in his spreadsheet came from A to Z Wholesalers' business records and documents Musallam provided to him about Fanci Candy's business performance. He testified that the profit-margin reflected on his spreadsheet as to each tobacco manufacturer was based on the respective costs of A to Z Wholesalers and Fanci Candy to acquire the tobacco products reflected on the spreadsheet as of July 1, 2013. And he testified that even though his total lost-profits calculation for the 31-month period was based upon the price of the tobacco products as of July 1, 2013, the resulting profit margin reflected on his spreadsheet as to each tobacco product was the same for the entire 31-month period because any fluctuation in the price he would have paid to acquire the tobacco cartons from the manufacturers during that period would have been passed along to A to Z Wholesalers when it purchased them from him, thus resulting in the exact same profit margin.[7] We conclude this lost-profits evidence was not fatally speculative.

_____

[7]For example, Ali testified that the profit margin of $1.24 per carton on Marlboro cigarettes reflected on his spreadsheet would have remained the same

Musallam next argues that the award of past lost profits was improper because Ali's testimony that he sustained $711,576.12 in past lost profits did not include a deduction for the total price he would have had to pay to acquire Fanci Candy's stock and assets. But Musallam has not cited any authority showing Ali was required to do so for a lost-profits calculation. And as Ali states in his brief, he sought damages for lost profits, not lost business value. *See CBIF Ltd. P'ship v. TGI Friday's, Inc.*, No. 05-15-00157-CV, 2017 WL 1455407, at *22–23 (Tex. App.—Dallas Apr. 21, 2017, no pet. h.) (mem. op.) (holding that where appellants' breach of contract and breach of fiduciary duty caused appellee to lose opportunity to acquire 15% interest in joint venture, appellee's calculation of lost profits was not invalidated by fact that it did not deduct the capital contributions it would have had to make to acquire the 15% interest because appellee's damage claim was for lost profits and not lost equity interest or lost business value). Lost profits are damages for the loss of net income to a business measured by reasonable certainty and, broadly speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity. *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.— Houston [1st Dist.] 2006, pet. denied) (citing *Miga v. Jensen*, 96 S.W.3d 207, 213

over the 31-month period regardless of whether the manufacturer changed the carton prices because "you don't look at the profit you make as a number. You look at it as a margin." Thus, Ali testified, if the price he had to pay to purchase Marlboro cigarettes directly from their manufacturer increased by two percent, then that would result in a corresponding increase in the price that A to Z Wholesalers would have to pay to purchase Marlboro cigarettes from Ali.

(Tex. 2002)).  And the evidence reflects that in calculating his lost profits, Ali took into consideration the expenses associated with Fanci Candy's related business activities.

Musallam also challenges the jury's lost-profits award by arguing that although Ali testified that his lost-profits calculation did not include the amount he would have had to pay in federal income tax, he never testified as to the actual amount of taxes he would have had to pay, nor did he provide any calculation of what his lost profits would have been after deducting taxes.  Musallam again fails to point us to any authority to support his argument.  But in any event, Musallam is mistaken in his contention that Ali never testified as to the amount of taxes he would have been required to pay on the lost-profits figure he calculated—Ali testified that his lost-profits calculation was subject to reduction by 33% for taxes.  Thus, even assuming the amount of lost profits Ali calculated should have been reduced by the amount of his federal income taxes, there was competent evidence showing with reasonable certainty what the amount of that reduction should have been.  *See Helena Chem. Co.*, 47 S.W.3d at 504 (stating that lost-profits award proper if the injured party shows the amount by competent evidence with reasonable certainty).  And the jury was instructed that "[a]ny monetary recovery for lost profits, past and future, is subject to federal income taxes," an instruction we presume it followed.  *See Tesfa v. Stewart*, 135 S.W.3d 272, 278–79 (Tex. App.—Fort Worth 2004, pet. denied) (stating that unless the record demonstrates otherwise, court must presume that the jury followed jury

20

instruction in answering question on damages caused by defendant's negligence).

Musallam next argues that Ali's lost-profits calculation was not established with reasonable certainty because Ali based it on the continued existence of Fanci Candy's direct-distribution agreement with Altria, an agreement Musallam contends Altria could have cancelled at any time after Ali purchased Fanci Candy. The record, however, contains evidence showing that the continued existence of Fanci Candy's direct-distribution agreement with Altria was more than speculation or a mere hope for success. *See AZZ Inc. v. Morgan*, 462 S.W.3d 284, 290 (Tex. App.—Fort Worth 2015, no pet.) ("'[R]easonable certainty' is not demonstrated when the profits claimed to be lost are largely speculative or a mere hope for success, as from an activity dependent on uncertain or changing market conditions, on chancy business opportunities, or on promotion of untested products or entry into unknown or unproven enterprises.") Ali testified that although Altria had the power to cancel Fanci Candy's direct-distribution agreement, his experience was that Altria would only do so if Fanci Candy failed to perform.[8] He further testified that had he been able to purchase

---

[8]Included in Ali's experience was his knowledge of the fact that A to Z Wholesalers had a direct-distribution agreement with Altria for John Middleton (another Altria tobacco manufacturer) products that was similar to Fanci Candy's direct-distribution agreement with Altria for Phillip Morris USA and U.S. Smokeless Tobacco products; that A to Z Wholesalers had performed under that agreement for decades; that Altria had kept that agreement in place during that time; and that as long as A to Z Wholesalers continued to perform and do what Altria told it to do, the agreement would stay in place.

Fanci Candy on July 1, 2013, it would have continued to perform sufficiently to maintain the distribution-agreement with Altria. And, of course, the evidence showed that Altria approved Ali's acquisition of Fanci Candy's direct-distribution agreement with it. Additionally, Musallam testified that when he originally acquired Fanci Candy in 2007, its direct-distribution agreement with Altria was already in place. And similar to Ali, Musallam testified that in the twenty or thirty years over which he had done business with Altria, his experience was that it would not cancel a distributor's direct-distribution agreement unless the distributor was bought out or went out of business. This evidence is sufficient to place the continued existence of Fanci Candy's direct-distribution agreement with Altria beyond the realm of speculation or mere hope for success into the realm of reasonable certainty.

Finally, Musallam argues that Ali's lost-profits calculation was based on the gross difference in price between the price for which A to Z Wholesalers could acquire certain Altria tobacco products and the price for which Fanci Candy could acquire them, and that, thus, Ali's lost-profits calculation represented gross profit rather than net profit. But Ali testified that he based his calculation on net profit. Specifically, Ali testified that the advantage of acquiring Fanci Candy was that he would step into the shoes of A to Z Wholesalers' middleman. Because A to Z Wholesalers had no direct-distribution agreement with certain of Altria's tobacco manufacturers, it could only acquire those manufacturers' tobacco products from a middleman, who sold those products to it at a marked-up price, i.e., a higher

22

price than Fanci Candy paid to acquire the same products. By acquiring Fanci Candy and its direct-distribution agreement with Altria, Ali could purchase the relevant tobacco products directly from their manufacturers at the lower price Fanci Candy was able to, and then he could sell them to A to Z Wholesalers at the same marked-up price its middleman charged. And Ali testified that his purchase of Fanci Candy would not result in any additional expenses in the sale of Altria tobacco products to his customers. Thus, the evidence sufficiently demonstrates that Ali based his lost-profits calculation on net profit rather than gross profit.

In sum, we conclude the lost-profits evidence summarized above is sufficient to support the jury's past and future lost-profits award. We overrule Musallam's second issue.

## IV. CONCLUSION

Having overruled all of Musallam's issues, we affirm the trial court's judgment. Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL: LIVINGSTON, C.J.; GABRIEL and PITTMAN, JJ.

DELIVERED: August 3, 2017

23